COMMONWEALTH of Kentucky,
Appellant

v.

Brian LEMONS, Appellee.

No. 2012–SC–000431–DG.

Supreme Court of Kentucky.

June 19, 2014.

Jack Conway, Attorney General of Kentucky, Jason Bradley Moore, Assistant Attorney General, Counsel for Appellant.

Susan Jackson Balliet, Assistant Public Advocate, Counsel for Appellee.

Opinion of the Court by Justice KELLER.

In the early morning hours of October 11, 2008, Brian Lemons (Lemons) stabbed and killed Cory Kessnick (Cory). After the trial court found that Lemons was not entitled to immunity under KRS 503.085 and denied his motion to dismiss, Lemons entered an *Alford*[1] plea to charges of second-degree manslaughter and assault under extreme emotional distress. Consistent with the plea agreement, the trial court sentenced Lemons to a total of fourteen years' imprisonment. Pursuant to his reservation of the right to appeal the trial court's order denying his motion to dismiss, Lemons appealed, and the Court of Appeals reversed. It is from that opinion that the Commonwealth now appeals. Having reviewed the briefs and oral arguments of the parties, we reverse the Court of Appeals and reinstate the judgment of the trial court.

## I. FACTS.

The following facts are not in dispute. Cory and his two brothers, Dustin Kessnick (Dustin) and Gary Damon (Gary), went to the Brass Ass, a bar in Newport, Kentucky, at approximately 9:30 p.m. on October 10, 2008. At closing time, which was approximately 2:30 a.m., the brothers left the bar. Cory, who was the designated driver, went to get Gary's truck, which was parked down the street from the bar. Gary and Dustin waited for Cory in the parking lot, which is adjacent to the bar. Several of the dancers from the bar were also in the parking lot, and Gary and Dustin joined them.

At or near that same time, Patrick Link (Patrick) and Lemons, pulled into the parking lot to pickup their respective girlfriends, Cassandra Maggard (Cassie)—

Patrick's girlfriend, and Yvonne Weaver (Yvonne)—Lemons's girlfriend and Cassie's mother. Yvonne was upset and complaining because she had not made any money that night. She took offense when one of the brothers commented that he had given her $5.00 to play the jukebox. An argument ensued, which devolved into a fistfight, during which Lemons stabbed Cory twice. Cory died from his wounds later that morning.

The witnesses to the altercation had different versions of how the fight started and who started the fight. There are two groups of witnesses, the brothers—Cory, Gary, and Dustin—and those affiliated with the bar—Yvonne, Lemons, Jaemichael Goodwin (Jae), and Patrick. The members of the two groups did not know each other; and, in their respective statements generally referred to members of the opposing group by description rather than by name. Those descriptions were generally based on the type and color of shirt. However, the descriptions are not consistent. For example, Cory was variously described as wearing a black shirt, a gray shirt, or a white striped shirt. For the sake of clarity, we use names where possible rather than descriptions in our summary of the various witnesses' versions of what occurred.

### A. Dustin's Versions

Dustin provided the investigating police officers with two statements, one within two hours of the fight and one three days later. The morning of the fight, Dustin stated that he had three or four beers while in the Brass Ass. When he and his brothers left, Cory went to get the truck, and Dustin and Gary went to the parking lot to smoke some marijuana with two of the dancers from the bar. While they were in the parking lot, two guys pulled up

**1.** *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

and, "Shit kind of blew." Dustin could not remember any details about how the fight began, because he "blacked out." However, he stated that, when he "came to," Cory was pulling into the parking lot. He remembered Cory jumping out of the truck, and the next thing he knew, Cory was on the ground. He went to help Cory and, while he was trying to help Cory, someone hit him in the back of the head. Dustin did not know what happened to Cory, and he did not know who hit him.

During his second interview, Dustin remembered that Lemons, Patrick, Yvonne, and another dancer went to the parking lot to smoke marijuana and that he and Gary joined them. One of the girls in the parking lot was complaining about not making any money. Dustin said that he told her to be quiet, and they argued. At some point after the argument started, Cory pulled into the parking lot and got out of the truck. According to Dustin, the next thing he knew, Cory was on the ground, bleeding. Dustin did not see who stabbed Cory, but he stated that Cory did not get out of the truck "aggressive" and that Cory would not have had a chance to hit anyone before being stabbed. Dustin did not believe he hit anyone, but he did recall being hit from behind.

## B. Gary's Versions

Like Dustin, Gary provided two statements to the investigating police officers. The morning of the fight, Gary stated that, after the brothers left the bar, Cory went to get the truck, and he and Dustin went to the parking lot to talk to Yvonne, and another dancer (later identified as Jae). At some point Lemons and Patrick arrived and joined the group. Yvonne was yelling because she had not made any money and words were exchanged. Lemons said something to Yvonne and Patrick said ev-

eryone should just calm down. Gary said that everything was "cool" and that the brothers were leaving. At some point, Cory pulled into the parking lot, someone said something,[2] and the next thing Gary knew there was a "big fight going on and . . . Cory's laying on the ground in a puddle of blood." Gary saw "three guys on top of Dustin swinging" so he went to help Dustin. Gary then saw Lemons running away, and he gave chase. However, Gary could not catch Lemons so he returned to the parking lot. Gary did not see Cory fighting with anyone and, although he admitted that he had been drinking, Gary said he understood what he was saying.

During his second interview, Gary stated that Cory did not pull into the parking lot until after the argument had started. When he heard the truck pull up, Gary said to Dustin, "Let's go. Let's get out of here." The next thing he knew, "all hell broke loose and [he turned] around and [Cory was] laying on the ground." According to Gary, "Cory did not get one step out of that truck[,] and he was on the ground." Cory was not fighting with anyone and no one started "throwing any fists" until after he saw Cory on the ground. Gary did not see Dustin get hit. Finally, he stated that he had "probably twelve beers" that night, but he knew what he was doing and saying when the police first interviewed him.

## C. Yvonne Weaver's Version

Yvonne provided a statement to the police the morning of the fight. She stated that she got to work at 8:00 p.m. and left work near closing time, 2:15 a.m. After leaving the bar, Yvonne went to the parking lot to smoke a cigarette with two of the other dancers and Jae. While they were in the parking lot, three men (Cory and his

---

2. Gary did not specify what was said or who said it.

brothers) walked up to them. One of the men made a comment she did not like, and she "got rude with him." At that point, Lemons and Patrick pulled into the parking lot. The man again said something Yvonne did not like, and she "tried to jump in his face," but Lemons grabbed her. She pulled away, pointed her finger at the man, and he picked her up and threw her to the ground. As she was trying to get up, a third man pulled up in a truck and all three men jumped on Lemons and Patrick. According to Yvonne, she tried to diffuse the situation but was thrown back down by one of the men. She was not sure who threw her to the ground, but she thinks it was the man who got out of the truck. She stated that the guy from the truck had Lemons and Patrick on the ground, and the next thing she knew, Lemons was carrying her out of the parking lot to the corner of the building. She kept hitting Lemons to get him to let her go back to the parking lot so she could check on Jae and Patrick. Eventually Lemons let her go, and she went to help Patrick, who was lying on the ground.

### D. Jaemichael Goodwin's (Jae) Version

Jae, who had previously been a dancer at the bar, was there that night celebrating her graduation from paralegal school. At closing time, she stopped outside the bar to talk to the three brothers. She saw Yvonne come out of the bar and go back to the parking lot. Jae eventually went back to check on Yvonne, who seemed upset. After a few minutes, Lemons and Patrick pulled into the parking lot, and the brothers walked into the lot. Jae believes that two of the brothers then left and the remaining brother and Yvonne started arguing. Lemons and Patrick both told Yvonne to calm down. A truck then pulled into the lot and the two brothers jumped out. The driver, presumably Cory, hit Patrick as soon as he got out of the truck.

Patrick fell to the ground, and Jae turned to help him. When she turned around again, Cory was lying on the ground bleeding. Jae stated that whatever happened to Cory must have happened very quickly because she did not see it. When Jae noticed Cory on the ground, Lemons was still holding Yvonne. Jae told one of the other two brothers that Cory had been hurt and that brother started chasing Yvonne and Lemons. Jae stated that she then called 911 and went over to help Cory. Shortly thereafter the police and emergency personnel arrived.

### E. Patrick's Version

The police did not interview Patrick until four days after the fight. Patrick stated that he and Lemons arrived at the Brass Ass at approximately 2:30 a.m. When they pulled into the parking lot, Jae and Yvonne were with two men, who were smoking marijuana. One of the men said something that offended Yvonne. Patrick told the man not to pay any attention to Yvonne because she had been drinking, and Lemons pushed Yvonne to keep her from going after the man. At that point Cory pulled into the lot. He jumped out of the truck and hit Patrick twice, once in the face and once in the neck, knocking Patrick to the ground. Jae then yelled at the brothers and Patrick noticed Cory was on the ground. Patrick stated that he may have been "knocked out for a split second or two" and that he was dazed.

### F. Lemons's Versions

Police officers Gross and Vance interviewed Lemons at the scene and in the police department parking lot. In his confidential report, Officer Gross stated that Lemons said he saw a man throw Yvonne to the ground. Lemons stated that, when another man approached him, he ran. Lemons stated that he was unsure what

had happened, that he had nothing to do with any events that transpired, and that he had not stabbed anyone. Officer Gross noted that Lemons changed his story several times, in particular stating that he had not run away but had been running around the crime scene.

Lemons provided a recorded statement to police several hours later that morning. According to Lemons, when he and Patrick arrived in the parking lot, Yvonne, three other women, and two men were standing by a truck. Yvonne was complaining that she had not made any money and she got angry when one of the men said something to her. Lemons tried to pull Yvonne back and calm her down. Patrick and the two men then began arguing and a third man arrived in a truck. That man, presumably Cory,[3] jumped out of the truck and punched Patrick in the face, knocking him to the ground. When Patrick got up, one of the other men started punching him. Cory then hit Yvonne, knocking her to the ground, and Lemons and Cory began fighting each other. Cory punched Lemons in the ribs and Lemons punched Cory in the face. Cory backed off for a second, then said he was going to kill Lemons. Lemons pulled out his knife and told Cory to get away and leave him alone. Cory charged at Lemons and Lemons stabbed Cory in the shoulder blade area. Cory kept coming, so Lemons stabbed him again. One of the other brothers started "coming at" Lemons, so Lemons started running. According to Lemons, that brother and Cory chased him for a short distance then returned to the parking lot. Lemons threw the knife into a garbage can

and, when he saw Yvonne come around the corner of the building, he went to check on her. They both then returned to the parking lot to check on Patrick, and Lemons saw Cory lying on the ground. At that point the police arrived. Finally, Lemons stated that he was in fear for his, Yvonne's, and Patrick's lives, and he just wanted Cory to stop.

## G. Other Evidence

In a confidential report, Officer Ripberger stated that, when he arrived, Cory was on the ground in a large pool of blood. Patrick was also on the ground and appeared to be unconscious. When he recovered, Patrick told Officer Ripberger that Cory threw the first punch, knocking him out. Gary told Officer Ripberger that Cory was on the ground and bleeding immediately after he got out of the truck.[4]

## III. PROCEDURAL HISTORY.

Three weeks before the fourth scheduled trial date, Lemons filed a motion to dismiss based on KRS 503.085, which, in pertinent part, provides immunity, from criminal prosecution to persons who use force in defense of self or others, unless there is probable cause to believe the use of force was unlawful. The trial court denied Lemons's motion finding that the Commonwealth had produced "sufficient evidence to support a finding that probable cause exists to conclude [Lemons's] use of force was unlawful." In doing so, the court noted the following: (1) the location of stab wounds raised a question about the lawfulness of the force used by Lemons; (2) Cory had no other injuries; (3) Lemons

---

3. We note that Lemons described the person he stabbed as wearing a white striped shirt. However, based on the medical records, Cory had on a black shirt.

4. We note that the police also took a statement from Cassandra Maggard the morning

of the fight. However, she was not present when the fight began or during the fight and her statement is based purely on hearsay. Neither the trial court nor the Court of Appeals referred to or relied on this statement. Therefore, we have not summarized it herein.

had no self-defense wounds; (3) while Jae, Patrick, and Lemons said that Cory was involved in the altercation, Dustin and Gary said he was not; (4) the statements from all witnesses revealed a "plethora of inconsistencies that can only be reconciled by presenting the testimony to the jury;" (5) both Gary and Dustin stated that Cory had been stabbed and was on the ground "almost immediately upon arrival" in the parking lot; (6) Jae's, Patrick's, Lemons's, and Yvonne's statements cannot be reconciled with each other; (7) Lemons gave conflicting and inconsistent statements about his participation in the fight; (8) Lemons said that Cory chased him after being stabbed twice; and (9) no one saw Lemons stab Cory. Based on the preceding, the court concluded that "[t]hese contradictions cannot support a determination that the force used by [Lemons] was lawful or that he was acting in self defense." However, the court indicated that, if Lemons could produce sufficient evidence to support his version of events, "an instruction on self-defense may be warranted." Finally, the court stated that "looking at the evidence in the record and considering the totality of the circumstances ... there is a sufficient basis to conclude probable cause exists that the use of force employed by [Lemons] was unlawful."

The Court of Appeals, in a divided opinion, reversed. *Lemons v. Commonwealth,* 2010–CA–001942–MR (Ky.App. June 22, 2012). In doing so, the Court first noted that KRS 503.085 requires the Commonwealth to put forth direct or circumstantial evidence that casts doubt on the defendant's credibility to refute a claim of self-defense or defense of others. *Id.* Slip Op. at 11. The Court then undertook a *de novo* review of the evidence of record and concluded that the trial court's reliance on contradictions in Lemons's statements and variance among the witnesses' statements

was misplaced. Reviewing that evidence, the Court stated that:

> While the versions of events given by [Patrick] Link, [Jae] Goodwin and [Yvonne] Weaver differ in certain details based on their respective locations and abilities to perceive the events, the differences in their accounts fall within the normal range of variation expected when different people with different vantage points describe a chaotic event.

*Id.* Slip Op. at 13.

Additionally, the Court noted that:

> Gary Damon and Dustin Kessnick both gave inconsistent and vague accounts of the fight. Neither stated how the fight started or who threw the first punch. And neither of them saw the confrontation between Lemons and Cory Kessnick. Furthermore, Gary Damon stated that he had consumed at least twelve (12) beers that evening, and Dustin Kessnick stated that he blacked out at some point during the fight. Consequently, their statements regarding the events are of doubtful reliability.

*Id.* Slip Op. 13–14.

The Court then stated that it failed to understand how the absence of any defensive or other wounds on Cory supported the Commonwealth's claim that he was not the initial aggressor. *Id.* Slip Op. at 14. Finally, the Court noted that Lemons's behavior and statements after the fight—running away, disposing of the knife, initially denying any involvement—were suspicious; however, the Court held that evidence, although putting Lemons's credibility at issue, was not sufficient to meet the Commonwealth's burden of proof. *Id.* Slip Op. at 15. Thus, based on its review of the record, the Court held that the Commonwealth failed to meet its burden.

The dissent stated that the trial court's task was "simply to make a practical, common-sense decision whether, given all the circumstances set-forth in the record ... there [was] a fair probability that the defendant's use of force was unlawful." *Id.* Slip Op. at 20. Once the trial court made that determination, the reviewing court's task was "simply to ensure that the trial court had a substantial basis for concluding that probable cause existed," not to conduct a *de novo* review of the record. *Id.* The dissent believed there was substantial evidence in the record to support the trial court's decision, thus, the Court should have affirmed. *Id.* Slip Op. at 21. For the reasons set forth below, we agree with the dissent.

## IV. ANALYSIS.

The primary issue before us is whether the Court of Appeals applied the correct standard when reviewing the trial court's order. In *Rodgers v. Commonwealth*, 285 S.W.3d 740 (Ky.2009) we touched on this issue, but because Rodgers had been tried and convicted by a jury that considered his self-defense argument we did not directly address the appropriate standard of review. We do so now.

KRS 503.085 reads as follows:

(1) A person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force, unless the person against whom the force was used is a peace officer, as defined in KRS 446.010, who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law, or the person using force knew or reasonably should have known that the person was a peace officer. As used in this subsection, the term "criminal prosecution" includes arresting, detaining in custody, and charging or prosecuting the defendant.

(2) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (1) of this section, but the agency may not arrest the person for using force unless it determines that there is probable cause that the force that was used was unlawful.

(3) The court shall award reasonable attorney's fees, court costs, compensation for loss of income, and all expenses incurred by the defendant in defense of any civil action brought by a plaintiff, if the court finds that the defendant is immune from prosecution as provided in subsection (1) of this section.

In *Rodgers*, we noted that the preceding offers little by way of guidance for trial courts regarding how to proceed in evaluating claims of immunity based on self-defense or defense of others. Therefore, we undertook an analysis of the statute to determine what the legislature intended. We concluded that, at each step of the criminal prosecution-defined as arresting, detaining, charging, or prosecuting-there must be "probable cause to conclude that the force used [by the defendant] was not legally justified," or the case must be dismissed. *Id.* at 754.

We then noted that, although those in the criminal justice system are familiar with the standard of probable cause, "it often eludes definition." *Id.* However, we also noted that we had recently used the definition provided by the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983): "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat

set of legal rules." We went on to state that:

> Just as judges consider the totality of the circumstances in determining whether probable cause exists to issue a search warrant, they must consider all of the circumstances then known to determine whether probable cause exists to conclude that a defendant's use of force was unlawful. If such cause does not exist, immunity must be granted and, conversely, if it does exist, the matter must proceed.

*Id.* at 754–55. The majority opinion of the Court of Appeals is in agreement with the preceding, and we do not find fault with that portion of the majority opinion.

▇▇▇ However, we do take issue with the holding by the majority of the Court of Appeals that the appropriate standard of review is *de novo*. In support of its opinion, the majority cited to *Commonwealth v. Banks*, 68 S.W.3d 347 (Ky.2001) wherein we adopted the holding by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1995) that a trial court's findings regarding the legitimacy of a warrantless search are subject to *de novo* review. *Lemons*, 2010–CA–001942, Slip. Op. at 9). However, the appropriate standard of review is the one developed by the U.S. Supreme Court in *Gates*.

> [A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [offered to establish probable cause] should not take the form of *de novo* review.... [T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.

462 U.S. at 235, 103 S.Ct. 2317 (internal citation omitted). As we recently empha-

sized, the *de novo* standard in *Ornelas* should be limited to warrantless search cases because it "tends to lead to overly technical analysis." *Commonwealth v. Pride*, 302 S.W.3d 43, 48 (Ky.2010). Such analysis is not appropriate in reviewing a determination of probable cause in a warranted search case nor is it appropriate in a determination of probable cause in a self-defense/defense of others immunity case.

Having set forth the correct standard of review, we must now determine if the trial court had a substantial basis for denying Lemons's motion to dismiss. "Probable cause has ... been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *Commonwealth v. Jones*, 217 S.W.3d 190, 200 (Ky.2006) *citing United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990).

▇▇▇ The evidence of record herein is, at best, inconsistent. Gary and Dustin stated that Cory went to the ground immediately after he got out of the truck. If that version of events is true, then Cory could not have been involved in the fight and Lemons could not have been acting in self-defense or in defense of others when he stabbed Cory.

Furthermore, the timelines from the other witnesses are inconsistent with Lemons's version of events. Lemons stated that Cory jumped out of the truck, punched Patrick and hit Yvonne knocking her to the ground. According to Lemons, he and Cory began fighting, Cory punching Lemons in the ribs and Lemons punching Cory in the face. They then exchanged threats, Lemons pulled out his knife, and when Cory charged, Lemons stabbed him. According to Jae, she went to help Patrick, yelled at the brothers, and when she turned around, Cory was down. According to Patrick, Cory punched him,

he passed out for a second or two and then he saw Cory on the ground. It is reasonable to believe that Lemons's version of events could not have occurred in the time frames outlined by Jae and Patrick. That is sufficient to cast more than a "mere suspicion" on Lemons's version of events.

Furthermore, the evidence indicates that Cory did not have any wounds or injuries other than the stab wounds. The majority of the Court of Appeals was dismayed that the Commonwealth could argue that this evidence negated Lemons's claim that Cory was the initial aggressor. We are not. If, as Lemons claims, Cory had punched Patrick twice, Lemons once, and Yvonne once, it is reasonable to believe he would have had some injuries to his hand or hands. Furthermore, if Lemons had punched Cory in the face, as Lemons said he did, then it is reasonable to believe the Cory would have had a discernable facial injury. Again, these facts create more than a mere suspicion that Lemons's version of events was not correct and that he did not have legal justification to stab Cory. Therefore, the trial court's denial of Lemons's motion to dismiss was not erroneous.

## V. CONCLUSION.

The Court of Appeals applied the incorrect standard of review in reversing the trial court's denial of Lemons's motion to dismiss. The correct standard of review in cases involving claims of immunity under KRS 503.085 is not *de novo*, but whether there was a substantial basis for the trial court's findings. Having reviewed the record, we conclude that there was a substantial basis for the trial court's findings; therefore, we reverse the Court of Appeals. The trial court's judgment is reinstated.

All sitting. MINTON, C.J.; ABRAMSON, CUNNINGHAM, NOBLE and VENTERS, JJ., concur. SCOTT, J., concurs in result only.