RENDERED:  DECEMBER 16, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0139-MR

GREGORY WAHL                                          APPELLANT

ON APPEAL FROM GARRARD CIRCUIT COURT
V.                HONORABLE HUNTER DAUGHERTY, JUDGE
NO. 2018-CR-00089

COMMONWEALTH OF KENTUCKY                    APPELLEE

## OPINION OF THE COURT BY JUSTICE LAMBERT

## AFFIRMING

Gregory Wahl (Wahl) was convicted of one count of first-degree assault and one count of being a second-degree persistent felony offender.  He was thereafter sentenced to forty-five years and now appeals his convictions to this Court as a matter of right.[1]  After review, we affirm.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The facts in this case are hotly contested. Therefore, we will outline the basic undisputed facts, then summarize the relevant testimony from the witnesses.

---

[1] Ky. Const. § 110(2)(b).

Without doubt, on May 28, 2018, there was an altercation at the home of Wahl and his fiancé, Alisha Sharp (Alisha), that left Alisha's father, Steven Christopher Gifford (Chris), severely injured.[2]

Wahl and Alisha lived in a trailer on the property of Chris and his wife, Alisha's mother, Beverly Gifford (Beverly). The trailer was located a short distance from Chris and Beverly's (the Giffords) home and on the same property as that home. Alisha was allowed to live in the trailer, but there was no formal agreement between the parties regarding tenancy. Wahl and Alisha lived there with their child in common, who was two years old at the time of the incident. Sometime before May 28, 2018, the Giffords had noticed two other people they did not know were staying overnight at the trailer. Prior to the incident, they developed concern regarding the guests because of the tender age of their granddaughter.

On May 28, 2018, Alisha's eighteen-year-old son, Ty Sharp (Ty), wanted to see his little sister before leaving town and had come to visit his grandparents. He and Beverly walked the short distance from the Giffords' residence to Wahl and Alisha's trailer. Once there, they saw Wahl and a man unknown to either of them in the driveway packing the vehicle that the Giffords allowed Alisha to drive. They met Alisha at the door, and took the child back to

_____

[2] The Commonwealth and the Appellant have alternate spellings of Alisha Sharp's given name. Because her name was spelled this way in the jury instruction, we adopt this spelling throughout. Further, because some relevant persons share a last name, we will refer to them by their first name.

the Giffords' residence. The pair saw Chris on the way back, and alerted him to the strange man at the trailer. According to Beverly, Chris was frustrated because both she and he had told Wahl and Alisha several times that there were to be no more strangers living with them in the trailer.

After hearing from Beverly and Ty that a strange man was at the trailer, Chris grabbed a garden tool close to him in the barn to stabilize himself, and began walking to the trailer.[3] Chris was sixty-three years old at the time, suffered from vertigo, and used a cane or walking stick to keep his balance. According to Chris, he was concerned for his daughter and granddaughter, and wanted to inform Alisha and Wahl that he would be beginning eviction proceedings to remove them and their unknown overnight guests. He also wanted to convey to Alisha that she and Wahl were welcome to come back once the strangers were evicted, but that it was his understanding that he had to evict them all to remove the strangers first. According to Alisha and Wahl, Chris was angry with them for having unknown persons at the trailer and had merely come to confront them about it. Either way, Chris made his way to the trailer with the mutt in hand, which he and Beverly testified that he had used as a walking stick numerous times.

Several diverging accounts exist regarding what happened once Chris reached the trailer.

---

[3] Though called various names throughout the trial, the record reflects that this was a long wooden tool with a rectangular metal plate secured to the end that is used as a scraper and chopper, and commonly referred to as a mutt. Therefore, we refer to the tool as a mutt for clarity.

According to Wahl, he and Alisha saw Chris coming with the mutt in hand at what Wahl described as a "pretty good clip." Chris appeared angry as he approached and yelled, "I'm going to kill you, motherfucker," and then swung the mutt at Wahl. Chris did not make physical contact with Wahl. Wahl then grabbed a stick that was resting near a trashcan by the trailer to defend himself, but did not swing it at Chris. In the interim, he heard Alisha exclaim "dad, what are you going to do, try and kill me, too?" Chris then turned his fury toward Alisha, who was seated in a car parked outside the trailer, and swung the mutt at her. It bounced off the door, and struck and penetrated the windshield. It was at this time that Wahl struck Chris for the first time in the head. Chris fell, tried to get up, and Wahl struck him at least three more times.

Alisha testified that Chris looked angry when he approached the trailer. He was using the mutt as a walking stick and walking at a normal pace. There was a conversation about evicting her and Wahl from the trailer. For some reason unknown to her, Chris screamed, "You sorry motherfucker!" at Wahl and the two exchanged insults. Not used to hearing her dad cuss, Alisha thought to herself, "He's pissed off big time." Chris swung the mutt at Wahl at least three times, during which time Wahl grabbed the stick on the trashcan. Alisha decided at this point that the best way to end the altercation was to leave, so she walked to the car and opened the door. She told Wahl they should leave, at which point Chris noticed her, turned and walked toward her. Chris then raised and swung the mutt at her, and struck the windshield of the

vehicle. She said, "dad, what are you going to do, try and kill me, too?" The mutt came close to her head, and she was fearful for her life. Wahl then struck Chris in the head with the stick. Chris tried to get up or grab the tool, and Wahl struck him in the head with each attempt to move. Once Chris stopped moving and Wahl stopped striking him, Alisha called 911 and went to the Giffords' house to find her children.

According to Chris, when he approached the trailer Wahl was holding two sticks in his hand. He asked Wahl what the strange man was doing at the trailer. Chris then told Wahl and Alisha that he would be evicting them and wanted to let them know before they got the paperwork. Wahl then started cursing at Chris, and Alisha opened the car door and told him that she did not have to listen to him. She did not get inside the car and was standing adjacent to the open car door. In an attempt to get Alisha to stay to discuss the situation, he slammed the mutt onto the vehicle in frustration. He wanted her to know he was serious. Chris then felt something strike him in the back of the head, intense pain followed. He then fell to the ground. He was not sure what had struck him. In an attempt to protect himself from further harm, he tried to roll under the vehicle, but Wahl hit him several more times in the head and face while yelling, "how do you like that, motherfucker!" His eyes were swelling, so he could not see what he was being struck with, but he no longer had the mutt in his hand.

According to Beverly, once she and Ty arrived back at the Giffords' home, she could see Chris walking toward the trailer through the tall grass. He was

using the mutt to help him walk.  Chris did not seem angry.  She thought that Chris was going to talk to Wahl and Alisha about evicting them from the trailer. It was uncommon, in her experience, for Chris to go down to the trailer.  Once she realized he would likely be discussing eviction, she, Ty, and the child went back outside the house and watched.  She could hear Wahl yelling, but could not hear Chris.  The two were standing about five to six feet apart.  Wahl was holding two sticks from the trashcan, and Chris was still holding the mutt he had used to help him walk to the trailer.  She heard Alisha tell Chris she was leaving and open the car door, but Alisha was standing next to the open door and not in the car.  From her point of view, it did not appear that Chris had swung the mutt toward Alisha, but she did see him slam the mutt onto the car, breaking the windshield.  She then saw Wahl strike Chris in the back of the head, and then saw Chris's body dip below the tall grass and out of her sight. She saw Wahl strike toward the ground several more times.  She instructed Ty to take the child into the house, and she drove down to the trailer.  Once there, she hurried to Chris.  He had deep gashes above his right eye and on his nose, was bleeding profusely, his eyes were swollen shut, and he was writhing in pain.  Beverly also saw Alisha walk toward the Giffords' house, and Wahl walk toward the barn.  She collected a bed sheet from the car, and wrapped it around Chris's head in an effort to stop the bleeding.

From the Giffords' home, Ty saw Chris talking to Wahl and Alisha at the trailer.  He could tell that Wahl was saying something loud and aggressive, but could not make out the exact words other than cuss words.  He knew that

Chris walked with the assistance of a cane or walking stick, and saw the mutt in his hand. He then saw Chris slam the mutt onto the car, breaking the windshield. He saw Wahl strike Chris, and then strike toward the ground once Chris fell, but could not see whether Wahl was striking Chris due to the tall grass.

After the incident, Alisha and Wahl separately called 911. Alisha, Ty, and the child stayed at the Giffords' home while Beverly tended to Chris, who was laying next to the vehicle with his eyes swollen and head bleeding. Meanwhile, Wahl walked toward the barn and laid in the grassy field until police arrived.

It took approximately fifteen minutes for Emergency Medical Services (EMS) workers to arrive at the Giffords' residence. Kay Roberts (Roberts) was the supervising paramedic who was dispatched to the residence. For approximately forty-five minutes she waited there with Alisha, Ty, and the child until police could arrive and ensure the EMS workers' safe entry to the trailer. While waiting, she got information from Alisha regarding what happened. Roberts testified she did so in order to be able to better treat Chris once her team could safely get to him. During that time, Alisha told Roberts that Wahl had struck Chris with the mutt. Roberts testified that she included that information in her report so that subsequent treating physicians could know what kind of object had caused the trauma to Chris's head and face.

Kentucky State Trooper Jacob Shepherd (Trooper Shepherd) arrived at the scene nearly an hour after the incident was over. He found Wahl speaking

7

to local police, approached Wahl and spoke with him, and then took his statement regarding the altercation. He noted that Wahl had sustained no injuries. Trooper Shepherd took several photographs at the scene, including of Chris, of the mutt, of the stick or sticks Wahl had picked up from the trashcan, of the vehicle, of the residences, and of the barn. However, Trooper Shepherd did not take the sticks or the mutt into evidence. Trooper Shepherd did take several other recorded statements. Wahl's recorded statement was played at trial, and so was Beverly's.

Wahl was indicted for first-degree assault and being a first-degree persistent felony offender on October 5, 2018 by way of the Garrard County Grand Jury. On December 20, 2019, Wahl filed a motion to dismiss the indictment, claiming immunity from prosecution pursuant to Kentucky Revised Statute (KRS) 503.085. KRS 503.085(1) provides in pertinent part that:

> [a] person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force […]. As used in this subsection, the term "criminal prosecution" includes arresting, detaining in custody, and charging or prosecuting the defendant.

The relevant portions of KRS 503.050 provide that:

> (1) The use of physical force by a defendant upon another person is justifiable when the defendant believes that such force is necessary to protect himself against the use or imminent use of unlawful physical force by the other person.
>
> (2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious

8

physical injury, kidnapping, sexual intercourse compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.

[. . .]

(4) A person does not have a duty to retreat prior to the use of deadly physical force.

The relevant portion of KRS 503.055(3) states that:

[a] person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

The trial court reviewed the entirety of the evidence in the record at the time of the motion and considered the foregoing statutes. The trial court then denied the motion to dismiss after reviewing the record in accordance with *Commonwealth v. Eckerle*,[4] and the case proceeded to trial.

Dr. Sri Rapuri was Chris's family physician. He reviewed the medical records that were created at the University of Kentucky Hospital (U.K. Hospital) where Chris was initially treated. Dr. Rapuri treated Chris after his release from U.K. Hospital, and testified about his extensive injuries at trial as an expert witness. Dr. Rapuri stated that Chris eventually had to have his right eye removed, has advanced scarring on his face and head from the altercation, suffered numerous skull fractures, and suffered a subdural hematoma in

---

[4] 470 S.W.3d 712 (Ky. 2015).

addition to the superficial injuries to the skin on his head and face. Based upon Dr. Rapuri's training and experience, he stated it would take a great amount of physical force to break the skull on the forehead. Dr. Rapuri stated that he also treated Chris for severe anxiety, panic attacks, post-traumatic stress, and nightmares related to the altercation. Following Dr. Rapuri's testimony, the Commonwealth moved to enter a limited number of certified medical records into evidence, including records from U.K. Hospital and records from Dr. Rapuri's office.

Alisha, Ty, Beverly, Chris, Roberts, and Trooper Shepherd testified at trial. Wahl also testified on his own behalf. Each recounted the occurrences of that day from their own perspective. Chris and Beverly were emphatic that Chris would never hurt Alisha, stating that their only other child died by suicide several years prior, and it had compelled them to nurture their relationship with Alisha and her children.

On direct examination, Alisha initially stated that she never saw Wahl with the mutt. Confronted with the paramedic's report during cross examination, Alisha stated that she did not remember telling Roberts that Wahl had the mutt and does not know why she would have said it, but conceded that Roberts would not have included it in her notes if she had not said it.

On direct examination, Alisha asserted that she had a loving relationship with Wahl. In an effort to impeach her, the prosecutor engaged in the following line of questioning:

> **Q:** You testified that you love Greg [Wahl], but aren't you scared of [him]?

10

**A:** Like, I don't…

**Q:** Fearful of him.

**A:** In what situation?

**Q:** Violence. That he may be violent with you.

**A:** I guess there have been times when we have had disagreements.

**Q:** Okay, so in the timeframe leading up to 2018, were you fearful of…

**A:** At that particular time, I was not fearful.

Defense counsel objected on the ground that notice was required to question Alisha for the purpose of impeachment on Wahl's prior bad act (i.e. charges of assault that Alisha had filed against Wahl) and moved for a mistrial. Defense counsel stated that the charges were for assault, and that the Commonwealth hinted to the jury that Wahl had assaulted the witness. The Commonwealth argued that he was not using the prior bad act in his case in chief, and therefore notice was not required under the rule. The trial court sustained the objection, but stated that mistrial was improper because Alisha had not discussed anything that he had done, and that an admonition would be sufficiently curative. Further, the trial court stated that, because Alisha's credibility was at issue and because her being fearful of Wahl would reflect her motivation for testifying, evidence of the pair's alleged domestic violence would have been admissible if the prosecutor had given proper notice. Defense counsel asked that the court not admonish the jury, fearing an admonition would leave more questions than provide answers.

After the close of the evidence, the jury was instructed on the charge of first-degree assault and the lesser-included offenses of second-degree and

11

fourth-degree assault. The jury also was instructed on the defenses of self-protection and protection of another. The jury found Wahl guilty of first-degree assault, and sentenced Wahl to twenty years during the guilt phase.

During the penalty phase, the Commonwealth read pertinent information from each of Wahl's previous convictions and entered certified copies of each as exhibits rather than introducing the convictions through live testimony. The exhibits reflect the following information about Wahl's prior convictions:

> (1) one count of fourth-degree assault in Casey County, Kentucky in 2004 (including the name of the assault victim);
>
> (2) one count of theft by unlawful taking in Boyle County, Kentucky in 2009 (including the name of a Wal-Mart manager as complaining witness and address of the Wal-Mart);
>
> (3) six counts of theft by deception in Casey County, Kentucky in 2010 (including the names of store managers as complaining witnesses and addresses of stores);
>
> (4) separate counts of driving under the influence, improper passing of a loading/unloading school bus, expired license plates, and eighteen counts of first-degree wanton endangerment (one count for each person on the bus, naming each person in the indictment) in Casey County, Kentucky in 2010;
>
> (5) two counts of second-degree trafficking in a controlled substance in Casey County, Kentucky in 2011 (containing the name of a Kentucky State Police officer as complaining witness).

The trial court allowed the exhibits (Commonwealth Exhibit Nos. 2, 3, 4, 5, and 6, respectively) to go with the jury into the deliberation room with no objection from defense counsel.

12

The jury found Wahl guilty of being a second-degree persistent felony offender during the penalty phase, which enhanced the sentence to forty-five years by the finding of persistent felony offender status. The trial court imposed the sentence as recommended by the jury. This appeal followed.

We discuss additional facts as necessary below.

## II. ANALYSIS

Wahl asserts a number of errors on appeal to this Court. First, Wahl contends that the trial court erred by denying his motion to dismiss the indictment on the basis of immunity. Second, Wahl argues that the trial court erred by allowing the Commonwealth to introduce the hearsay statement of Alisha that Wahl struck Chris with the mutt through the testimony and written report of EMS worker Roberts.[5] Third, Wahl argues that the trial court erred by not granting his motion for a mistrial after the Commonwealth questioned Alisha about whether Wahl had been violent toward her during cross examination. Fourth, and finally, Wahl contends that the trial court exceeded

---

[5] Wahl tangentially argues that paramedic Roberts made statements that were beyond lay testimony, and that she was not qualified as an expert to offer such an opinion. Namely, that she testified that it would take a great amount of force to break the frontal bone and that the deep lacerations on Chris's face looked like they had been made with a slim, heavy object. The trial court ruled that she could not state specifically which instrument was used but could detail what type of object would be consistent with the injuries she observed. Defense did not object to this testimony, therefore this alleged error was unpreserved. Kentucky Rule of Criminal Procedure (RCr) 9.22. Wahl did not request review for palpable error. "Ordinarily, when an issue is unpreserved at the trial court, this Court will not review it unless a request for palpable error review under RCr 10.26 is made and briefed by the appellant." *Webster v. Commonwealth*, 438 S.W.3d 321, 325 (Ky. 2014) (citing *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008)). Accordingly, palpable error review is denied. Further, we note that Dr. Rapuri made substantially the same statements during the trial, thus rendering any such comment by Roberts as merely cumulative.

13

the scope of KRS 532.055 when copies of documents related to his prior convictions were introduced and sent into deliberations with the jury. We take each argument in turn.

## A. The trial court did not err by denying Wahl's motion to dismiss the indictment under KRS 503.085.

Wahl contends that error occurred when the trial court denied his motion to dismiss the indictment on the basis of immunity.[6] He argues that the Commonwealth failed to point to sufficient evidence in the record at the time of the motion to support the trial court's probable cause finding under KRS 503.085. Further, he states that the trial court incorrectly determined that he was not immune from prosecution because at least some of the force may have been justified.

We ordinarily do not revisit a trial court's probable cause finding in cases in which "a jury has already convicted the defendant—and, thus, found [his actions were] unlawful beyond a reasonable doubt" unless there are flaws in the conviction.[7] Considering the seriousness and fact-intensive nature of the errors alleged by Wahl, however, we will review the trial court's denial of his immunity motion.

"The standard of review of a denial of a defendant's motion to dismiss for immunity from prosecution under KRS 503.085 is whether the trial court had a 'substantial basis' for finding probable cause to conclude that the defendant's

---

[6] This issue was preserved for appellate review upon Wahl's motion to dismiss pursuant to KRS 503.085. RCr 9.22.

[7] *Ragland v. Commonwealth*, 476 S.W.3d 236, 246 (Ky. 2015).

14

use of force was unlawful."[8]  This Court elucidated this rule further in *Ragland v. Commonwealth*, stating as follows:

> [t]he standard of probable cause is "a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."[9]
>
> It has been defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."[10]
>
> And judges must consider the totality of the circumstances then known to determine whether probable cause exists to conclude that a defendant's use of force was unlawful.[11]

As this Court has previously stated, "in order for the prosecutor to bring charges or seek an indictment, there must be probable cause to conclude that the force used by the defendant was not fully justified under the controlling provision or provisions of KRS Chapter 503."[12]  A defendant is justified in using deadly physical force "only when the defendant believes that such force is necessary to protect himself against death . . . [or] serious physical injury . . ."[13]  Under KRS 503.070(2), deadly physical force to protect another person is justified if "[t]he defendant believes that such force is necessary to protect a third person against imminent death . . . [or] serious physical injury" and

---

[8] *Id.* at 246 (citing *Commonwealth v. Lemons*, 437 S.W.3d 708, 715 (Ky. 2014)).

[9] *Id.* at 246 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

[10] *Id.* at 246 (quoting *Commonwealth v. Jones*, 217 S.W.3d 190, 200 (Ky. 2006)).

[11] *Id.* at 246-47 (citing *Rodgers v. Commonwealth*, 285 S.W.3d 740, 754-55 (Ky. 2009)).

[12] *Rodgers*, 285 S.W.3d at 754.

[13] KRS 503.050(2).

"[u]nder the circumstances as they actually exist, the person whom he seeks to protect would himself have been justified . . . in using such protection."

The trial court ruled that the force Wahl used was not fully justified after considering the following evidence: audio recordings of interviews with Beverly, Chris, Wahl, and Alisha, police reports, and photographs of the scene, including those of Chris's injuries, the walking sticks and mutt, and the vehicle. Inconsistent evidence and testimony alone provide the substantial basis upon which the trial court formed its probable cause finding that the force Wahl used was unlawful. The four interviews offered varying accounts of what happened and are critical to whether Wahl was entitled to self-defense or defense of another.

Beverly told Trooper Shepherd that Chris smashed the window with the mutt he was using as a walking stick, but he did not swing it at Alisha and had not swung it at Wahl at all. She then saw Wahl strike Chris in the back of the head, Chris fall, and Wahl strike Chris several more times.

According to Chris, Wahl was holding two sticks in his hand when Chris approached. Alisha came out of the house and asked him what he was doing down there. Chris explained he was going to evict them. He never attempted to strike either one of them. Wahl raised his stick at Chris, started screaming and cussing at him, then Alisha said she was leaving, and Chris slammed the mutt onto the car to stop her from leaving. Immediately, he was struck in the back of the head by Wahl, who had been standing behind him. Alisha said, "Dad, why did you try to kill me?" He did not lose consciousness. Wahl struck

16

him at least six more times while he was on the ground. He never tried to get up, and instead tried to roll under the vehicle to get away from Wahl.

Alisha told Trooper Shepherd that she saw her dad coming to the trailer with the mutt in hand. She said to him, "dad, I don't know what you're trying to do, but just leave." She then heard Chris tell Wahl that he would kill him, and saw him swing the mutt toward Wahl, but not strike him. Wahl then picked up a walking stick, and the two hit each other's sticks. Alisha tried to leave, and Chris tried to strike her with the mutt, but instead hit the windshield as she was trying to get in the car. Chris again swung the mutt at Wahl, and Wahl struck Chris in the head. Chris fell, and tried to get up, and Wahl struck him several more times until Chris quit trying to get up.

Wahl told Trooper Shepherd that he and Alisha were getting ready to leave when Beverly and Ty came to get the child. Ten minutes later, he saw Chris coming toward the trailer carrying the mutt. Chris told Wahl that he had come to kill him, and swung the mutt at him. Then Chris turned toward Alisha and swung at her while she was in the car, and struck the windshield. Chris then turned and swung at Wahl, and Wahl struck Chris in the head with a walking stick. Chris then fell to the ground. Wahl did not know how many times he struck Chris, but he kept striking him until he quit trying to get up.

These varying accounts alone provide the substantial basis upon which the trial court formed its reasonable grounds for belief that the force Wahl used was not justified. Wahl contends that Chris approached quickly with the intent to kill him and while possessing a deadly weapon. Chris and Beverly

17

contend that Chris approached without anger and with only a tool he carried to stabilize his unsteady and slow gate. Wahl contends that Alisha was in imminent danger. Chris contends that he would never harm his only surviving child and never swung the mutt at either her or Wahl. While Wahl contends that he only struck Chris while he was on the ground because he was trying to get up, Chris contends that Wahl continued to beat him when he tried to shield himself by seeking safety under the vehicle. These facts, which Wahl portrays as undisputed, are clearly at odds. These critical variances in the testimony have great effect on whether Wahl acted justifiably, and certainly on whether each blow dealt was justifiable. We conclude from the evidence that the trial court had a substantial basis to find that Wahl's use of force was unlawful. Therefore, the trial court did not err in denying Wahl's motion to dismiss the indictment based on his claim of self-defense or defense of others.

**B. Roberts' report and her testimony concerning it were admissible.**

Roberts' report and her testimony reflected that Alisha told her that Wahl had struck Chris with the mutt. Wahl contends that this is inadmissible hearsay evidence under KRE[14] 802.[15] We review a trial court's determination

---

[14] Kentucky Rule of Evidence.

[15] This issue was preserved for appellate review by defense counsel's contemporaneous objection and subsequent motion for a mistrial. RCr 9.22. In addition to alleging that the portion of the report that contains Alisha's statement is inadmissible hearsay, Wahl further alleges error in admission of the report as a whole on appeal, and posits that it was not admissible as a business record. Wahl did not raise this issue before the trial court. Wahl did not request palpable error review by this Court or brief how admission of the whole record would constitute palpable error reviewable by this Court under RCr 10.26. Therefore, we decline to address it. Thus, the sole question properly before us is whether the hearsay statement made by Alisha,

18

regarding the admissibility of evidence under the abuse of discretion standard.[16]

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[17]  Subject to a full panoply of well-established exceptions, hearsay is inadmissible.[18]

The Commonwealth chiefly relied on KRE 803(4) in arguing that the hearsay statement contained in the report and testimony concerning that hearsay statement were admissible.[19]  KRE 803(4) states in relevant part:

> [t]he following are not excluded by the hearsay rules, even though the declarant is available as a witness:
>
> Statements made for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis.

It is evident that Roberts' testimony and report regarding the out of court statement of Alisha was used to prove the truth that Wahl struck Chris with the mutt.  However, for the reasons discussed below, we hold that this

---

who did not have a business duty to make the statement, is admissible under some other hearsay exception.

[16] *Simpson v. Commonwealth*, 889 S.W.2d 781, 783 (Ky. 1994).

[17] KRE 801(c).

[18] *Moore v. Commonwealth*, 462 S.W.3d 378, 381 (Ky. 2015) (quoting *Wells v. Commonwealth*, 892 S.W.2d 299, 301 (Ky. 1995); then citing KRE 802).

[19] The Commonwealth argues in the alternative that the statement was admissible under KRE 801A(a)(1).  Because we hold the report was admissible under KRE 803(4), we need not and do not address that argument.

statement was properly admissible under KRE 803(4)'s exception to the general bar on hearsay.

The admission of the report presents a rather unique question: do EMS pre-hospital care reports containing hearsay fall within the definition of medical records excepted from the bar on hearsay under KRE 803(4)? Having extensively reviewed the precedent of this Court, we are not satisfied that we have directly addressed this question.

Professor Robert Lawson has accurately pointed to the basics of the rule:

> [m]ost of the hearsay admitted under the exception will consist of statements made to treating physicians, but the defining language of KRE 803(4) does not limit the exception to such statements for good reason (as drafters explained in their commentary on the exception):
>
> The language of subsection (4) does not limit the coverage of the exception to statements made to physicians. It is commonplace for physicians to use nurses, technicians, and other highly trained individuals, in the course of providing treatment to patients. The drafters of the Federal Rule made the following statement about this issue: Under the exception the statement need not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even members of the family might be included . . . Extending coverage to statements made to family members may be somewhat extravagant. But it is proper to apply the exception to statements made to medical personnel.
>
> Most of the hearsay admitted under the exception will consist of statements made by patients, but once again the language of the defining provision extends beyond the normal situation to cover statements made by third persons on behalf of patients (such as statements made by parents to physicians in obtaining treatment of their children) so long as they are made for purposes of diagnosis or treatment. In addition to

20

having been made for this purpose, qualifying statements must fall into one of these three categories: (1) medical history, (2) symptoms, pain, or sensations, or (3) the inception or general character of the cause or external source thereof.[20]

We agree with Professor Lawson. To the extent that EMS care reports contain statements made to paramedics for the purpose of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as the statements are reasonably pertinent to treatment or diagnosis, these records may be generally admissible under KRE 803(4). A statement made to paramedics for the purpose of diagnosis or treatment, "like any other relevant evidence, is subject to exclusion if its probative value is substantially outweighed by the danger of undue prejudice [...], confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[21] "The balancing of the probative value of such evidence against the danger of undue prejudice is a task properly reserved for the sound discretion of the trial judge."[22]

---

[20] Robert Lawson, *The Kentucky Evidence Law Handbook,* § 8.55[1][a] at 746 (LexisNexis Matthew Bender 2019) (quoting Evidence Rules Study Committee, Kentucky Rules of Evidence—Final Draft, p. 85 (Nov. 1989)).

[21] *Garrett v. Commonwealth,* 48 S.W.3d 6, 14 (Ky. 2001) (citing KRE 403).

[22] *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

However, we caution that "[t]his exception to the hearsay exclusionary rule does not open the door to testimony by"[23] paramedics to all conversations with witnesses or the patient. [24]  As this Court has detailed, whether statements are excepted from the general bar against hearsay under the medical diagnosis and treatment exception is "governed by a two-prong test: (1) the declarant's motive in making the statement must be consistent with the purpose of promoting treatment; and, (2) the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis."[25]

Under the first prong of the test, the declarant's motive must be carefully scrutinized.  "This exception to the hearsay rule is premised on the notion that a declarant seeking treatment has a selfish motive to be truthful because the effectiveness of medical treatment depends upon the accuracy of the

---

[23] *Tackett v. Commonwealth*, 445 S.W.3d 20, 27 (Ky. 2014).

[24] We further caution that a paramedic's care report will not always admissible, and certainly not always admissible in full.  In *Gillam v. Commonwealth*, an unpublished opinion, this Court determined that a victim's statements made to an Emergency Medical Technician (EMT) regarding the identity of her attacker were testimonial, and therefore implicated the confrontation clause, and were also not relevant to her treatment or diagnosis.  No. 2007-SC-000180-TG, 2008 WL 4291544, at *5 (Ky. Sept. 18, 2008).  We analogized statements made by the victim to an EMT regarding the identity of her attacker to those the victim made to police officers.  This logic was sound and appropriate under the facts of that case.  Then as now, "statements of identity are seldom if ever pertinent to diagnosis or treatment" when they are later sought to be admitted to prove that the defendant committed the charged criminal offense in that case. *Garrett*, 48 S.W.3d at 12.  Importantly, identity of the attacker is not at issue here, and Wahl had the ability to confront Roberts with the statement, and offered Alisha as his own witness.

[25] *Id.* (Ky. 2010) (internal citations and quotation marks omitted).

information provided."[26]  When a patient is unable to speak on their own behalf due to disability or infancy, this Court has held that the declarant's motive may be ascertained by their relationship with the patient.[27]  Statements made by close family members in such circumstances are inherently more reliable than statements made by non-family declarants due to the uniquely close nature of those relationships.  An adult child, who by all accounts had a close and loving relationship with her father, especially after the untimely death of her only sibling, would necessarily have a motive to be truthful to paramedics waiting in the wings to render aid to her gravely injured father during an ongoing emergency.

Under the second prong of the test, the plain language of KRE 803(4)—i.e., whether the statements were "***reasonably*** pertinent to treatment or diagnosis"—demands an objective test.[28]  An adult child's statement as to the "general character of the cause or external source" of her father's injury would logically be necessary for medical personnel to render effective aid.[29]  A trial court should consider all objective facts in the record to make its determination of whether the statement made would be pertinent to treatment or diagnosis.

---

[26] *Id.*

[27] *See Miller v. Watts*, 436 S.W.2d 515 (Ky. 1969), wherein this Court reaffirmed *Commonwealth, Div. of Forestry, Dep't of Conservation v. Farler*, 391 S.W.2d 371 (Ky. 1965), recognizing "that a patient's history related to a treating doctor by a member of the patient's family was admissible."

[28] (Emphasis added).

[29] KRE 803(4).

23

This case clearly demonstrates the circumstances under which hearsay statements contained in a paramedic's care report can be a medical record exempt from the hearsay bar under KRE 803(4).

Under the first prong of the test, the facts in the record indicate that Alisha had a strong motivation for truthfulness. Alisha called 911, and was the one who relayed the information that Wahl had struck Chris with the mutt to the paramedic. She testified that she made the call with the purpose of seeking medical treatment for her father and understood that he was gravely injured. Though she was not the patient herself, she did have a special relationship with the person for whom she was seeking medical treatment: that of a child concerned for her parent after he had been beaten. The emergent situation for which she was seeking medical assistance from the paramedic was still ongoing at the time she made the statement: the paramedics had yet to reach Chris due to their concern for their own safety, and he still laid where he had fallen with no aid other than a bedsheet to stop his bleeding. These facts underscore her motivation for truthfulness. Therefore, for the same reasons the trial court found, the first prong of the test is satisfied.

Under the second prong, the facts in the record strongly indicate that a statement identifying the weapon would, objectively, be relied on by a physician in treatment or diagnosis. Whether the trauma was blunt force, caused by a sharp object, a gun, or some other instrument is clearly pertinent to how emergency responders and other providers would treat Chris's injuries. Though the rule does not require that medical professionals actually rely on

24

the statement, it is clear here that Roberts did in fact rely on it. Roberts testified that she "always" included information regarding what caused the injury, because the more information that she had the better she could treat Chris' injuries. Therefore, for the same reasons the trial court found, the second prong of this test is satisfied.

We have carefully considered whether EMS care reports containing hearsay statements are excepted from the rule against hearsay when made for the purpose of medical treatment or diagnosis. We hold that these statements are admissible under KRE 803(4), unless rendered inadmissible under some other rule of evidence.

The statements contained in Roberts' report satisfy the requirements under 803(4) for the reasons discussed above. We cannot say that the probative value of this evidence was substantially outweighed by its prejudice. Which weapon Wahl employed to exert force was highly probative to whether that force was necessary. That he used one weapon over another was minimally prejudicial. We conclude that it was not error for the trial court to admit the report.

For the same reason, it was not error for the trial court to permit Roberts to testify about the report or its contents.

## C. The trial court did not err by denying Wahl's motion for a mistrial as the Commonwealth did not violate KRE 404(c).

Alisha did not testify for the Commonwealth but was called by the defense. During her direct examination, Alisha discussed how she and Wahl had a loving relationship and intended to get married. During the

25

Commonwealth's cross examination of Alisha, she was asked whether she had ever been fearful of Wahl. Alisha denied being fearful of him and defense counsel objected. At the bench conference, the trial court sustained the objection and offered to admonish the jury to disregard the question. Defense counsel declined the admonition and moved for a mistrial.

Wahl argues that these two or so questions about whether Alisha was fearful of Wahl were inadmissible evidence under KRE 402, 403, and 404(b), and that he was not given adequate notice as required under KRE 404(c).[30] Wahl argues that the only remedy for the implication that Wahl had assaulted Alisha in the past was a mistrial. However, Alisha answered that she was not fearful of Wahl and counsel's timely objection prevented the entry of any evidence of domestic violence between Alisha and Wahl. Therefore, we hold that the trial court did not abuse its discretion in denying Wahl's motion for a mistrial.

### D. The trial court did not commit palpable error by admitting proof of Wahl's prior convictions.

Wahl argues for reversal of his sentence and remand for a new penalty phase because the names of victims of his prior crimes were disclosed in

---

[30] The issue of admissibility under KRE 404 was preserved for appellate review by defense counsel's contemporaneous objection and subsequent motion for a mistrial. RCr 9.22. The issue of admissibility under KRE 402 and 403 was not preserved, but Wahl requests review for palpable error. "Ordinarily, when an issue is unpreserved at the trial court, this Court will not review it unless a request for palpable error review under RCr 10.26 is made **and briefed** by the appellant." *Webster v. Commonwealth*, 438 S.W.3d 321, 325 (Ky. 2014) (citing *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008)) (emphasis added). Aside from his cursory request, Wahl failed to brief how the trial court's ruling of admissibility under KRE 402 and 403 would constitute palpable error. Accordingly, we decline to address his argument concerning admissibility under KRE 402 and 403.

unredacted exhibits sent with the jury into deliberation.[31]   Wahl argues that the trial court exceeded the scope of KRS 532.055 when copies of documents related to his prior convictions were introduced and sent into deliberations with the jury.  The Commonwealth concedes that admission of certified copies of Wahl's prior convictions that included victims' names was error but argues that it did not result in manifest injustice, and, therefore, reversal is not warranted.

"Kentucky's Truth-in-Sentencing statute [(KRS 532.055)] is geared toward providing the jury with information relevant to arriving at an appropriate sentence for the particular offender."[32]  KRS 532.055 allows the prosecution to introduce evidence related to sentencing during the penalty phase of a defendant's trial.  KRS 532.055(2)(a) states that "[e]vidence may be offered by the Commonwealth relevant to sentencing including: (1) [m]inimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor; (2) [t]he nature of prior offenses for which he was convicted...."  This Court drew a bright line rule in *Mullikan v. Commonwealth* that "the evidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed."[33]  Therefore, "[t]he trial court should avoid identifiers, such as naming of victims, which might trigger memories of jurors who may—especially in rural areas—have prior knowledge about the crimes."[34]

---

[31] Wahl concedes this issue was unpreserved and requests this Court review for palpable error.  RCr 10.26.

[32] *Williams v. Commonwealth*, 810 S.W.2d 511, 513 (Ky. 1991).

[33] 341 S.W.3d 99, 109 (Ky. 2011).

[34] *Id.*

The exhibits at issue here clearly violate this Court's bright line rule. Submitting the records to the jury during deliberations was error. However, only if a "manifest injustice has resulted from the error" will we reverse under the palpable error standard.[35]

Palpable error is one "easily perceptible, plain, obvious and readily noticeable."[36] "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law."[37] Our "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process."[38]

In *Webb v. Commonwealth*, this Court determined that the admission of detailed prior-conviction evidence, which included victims' identities, was palpable error.[39] We held it was highly prejudicial for the identities of the victims, five of which were police officers, to be disclosed to the jury primarily because all of the victims in that case had also been law-enforcement or correctional officers.[40] Similarly, in *Stansbury v. Commonwealth*, this Court found palpable error in the admission of the past victims' names and records

---

[35] RCr 10.26.

[36] *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006).

[37] *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).

[38] *Id.*

[39] 387 S.W.3d 319 (Ky. 2012).

[40] *Id.*

detailing prior dismissed charges.[41]  In *Webb* and *Stansbury,* this Court

determined that because the improper evidence was either read to the jury by a

witness or prosecutor or was referenced or emphasized by the prosecutor

during argument, or both, that the unpreserved error required reversal.  In the

case at bar, however, no impermissible evidence of prior dismissed charges was

introduced as in *Stansbury,* and the victim in this case was not remotely

similar to the victims of Wahl's previous offenses as were in *Webb.*  The jury

heard only proper information regarding Wahl's criminal history and the

prosecutor did not refer to the other inadmissible information.  Therefore, we

find the facts in *Webb* and *Stansbury* distinguishable*.*

The facts presented by the instant case are more closely related to those

this Court considered in *Martin v. Commonwealth*[42] and *Wallace v.*

*Commonwealth.*[43]

In *Martin v. Commonwealth,* "copies of the final judgments were

introduced into evidence as documentary exhibits, and they did contain

references to original charges that were ultimately dismissed or amended to

lesser offenses."[44]  The prosecutor made no "testimonial or argumentative

reference to the improper evidence," and there existed "only the possibility that

---

[41] 454 S.W.3d 293 (Ky. 2015).

[42] 409 S.W.3d 340 (Ky. 2013).

[43] 478 S.W.3d 291 (Ky. 2015).

[44] *Martin,* 409 S.W.3d at 348.

the jurors might have gleaned that information if they looked at the judgments during their deliberations."[45]  This Court further noted that

> [w]hatever prejudicial influence the exhibits may have exerted was not apparent to the trial court or to Appellant's trial counsel.  Even upon our presumption that the documents went to the jury room and the further assumption that the jury became aware of the original charges underlying Appellant's prior

> convictions, we believe that it is unlikely that such knowledge affected the resulting sentence.[46]

Therefore, we held that "manifest injustice did not result and reversal for a new penalty phase is not appropriate."[47]

In *Wallace*:

> inadmissible evidence was only submitted to the jury through the various certified court documents and was intermingled with the properly admitted evidence.  The Commonwealth's witness recited to the jury only proper information regarding Wallace's criminal history—namely, the offenses resulting in convictions, relevant dates, and sentences—and the prosecutor did not refer to the other inadmissible information in closing arguments.[48]

Looking to *Martin* for instruction in *Wallace*, this Court found no palpable error, because there was no testimonial evidence or argumentative reference to any of the victims of Wallace's prior convictions.[49]

---

[45] *Id.* at 349.

[46] *Id.*

[47] *Id.*

[48] 478 S.W.3d at 301.

[49] *Id.* at 302.

Our holdings in *Martin* and *Wallace* are instructive and directly applicable in the instant case. Neither the prosecutor, the trial court, nor any witness referenced the names of the victims or their identities during the penalty phase, though the prosecutor did say that Wahl had been convicted of twenty-one felonies in an apparent reference to the twenty-one charges for which Wahl had either pled guilty or been convicted. The jury was entitled to know about these convictions. Despite this knowledge, the jury did not deliver the maximum sentence available. Further, the jury was presented with testimony supporting a theory that Wahl believed he acted in self-defense, or in defense of Alisha, but chose to reject it. We do not believe it more likely that the sentence would have been more lenient absent the inadmissible evidence.

As a result, although there was error in submitting the unredacted exhibits to the jury, it was not palpable. Wahl's sentencing was fundamentally fair. Wahl's other crimes were not committed in Garrard County, and, therefore, are less likely to "trigger memories of jurors who may [. . .] have prior knowledge about the crimes."[50] Therefore, we hold now as we did in *Wallace*, that "the erroneous admission of the improper penalty-phase evidence did not result in manifest injustice and does not warrant reversal."[51]

### III.  CONCLUSION

For the reasons set forth above, the judgment of conviction and sentence of the Garrard Circuit Court are affirmed.

---

[50] *Mullikan*, 341 S.W.3d at 109.

[51] *Wallace*, 478 S.W.3d 291 at 302.

31

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Kathleen K. Schmidt
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Mark D. Barry
Assistant Attorney General