RENDERED: MAY 5, 2016
TO-BE-PUBLISHED

𝔖upreme 𝕮ourt of 𝕶entucky

FINAL

2014-SC-000249-MR

DATE 5-26-16 Emily Grounth P.C.

STEPHEN W. WILLIAMS                                                    APPELLANT

V.

ON APPEAL FROM RUSSELL CIRCUIT COURT
HONORABLE VERNON MINIARD, JR., JUDGE
NO. 10-CR-00013-001 & 11-CR-00001

COMMONWEALTH OF KENTUCKY                                APPELLEE

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

### AFFIRMING

Stephen D. Williams shot and killed Paul Montgomery in an apparent dispute over betrayal and drugs. A circuit court jury found Williams guilty of murder, first-degree burglary, and tampering with physical evidence. Williams was sentenced to life in prison with possibility of parole after 25 years. Williams appeals the resulting judgment as a matter of right.[1] We affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Paul Montgomery died from a wound suffered from a single shotgun blast to the chest, and a neighbor discovered his body the following day. Suspects did not emerge until nearly two years later when one of the murder participants, Danny Hill, came forward to police.

---

[1] Ky.Const. § 110(2)(b).

Based upon Hill's narrative and information from various other witnesses, Stephen Williams also became a suspect. Montgomery and Williams were both involved in the area drug trade. Montgomery became a police informant and testified against Williams in a criminal prosecution. Williams, according to his friends, pledged to get revenge for this perceived betrayal.

Hill and Williams had been drinking late into the evening. In Hill's mind, the time had come to kill Montgomery, and he told Williams as much. Eventually, Williams retrieved his shotgun, a handful of shells, and a change of clothes; and the two set out for Montgomery's house in Williams's automobile.

The duo arrived in Montgomery's driveway around 3:00 A.M. They found Montgomery was home, and, unknown to Williams and Hill, Barbara Aarons was also there. She had stopped by to give Montgomery some cigarettes and obtain cocaine from him. They knocked at the door. Montgomery recognized Hill and Williams and let them inside. Williams angrily paced the room while Montgomery and Hill sat on opposite ends of the couch. Williams accused Montgomery of snitching on him and confronted Montgomery about an alleged debt he owed Williams. An argument ensued as Montgomery professed to have no money to give and denied Williams's assertion that he was entitled to take whatever property he wanted from Montgomery. Montgomery ordered Williams and Hill out of his house. Williams then grabbed the shotgun from beside the couch and shot Montgomery in the chest. Williams and Hill then left the house. Aarons, hiding in an adjacent bedroom during the entire altercation, left through a side door.

Williams was indicted for murder, tampering with physical evidence, and first-degree burglary. A circuit-court jury found him guilty of all charges and

2

recommended a sentence of life in prison without the possibility of parole for 25 years, and the trial court entered judgment accordingly.[2]

## II. ANALYSIS.

### A. Williams was not Entitled to a Directed Verdict on his Burglary Charge.

Williams claims the trial court erroneously denied his motion for directed verdict on the burglary charge. In support of this allegation, he argues that the Commonwealth failed to meet its burden—specifically with regard to proving Williams entered or remained unlawfully on Montgomery's premises. William's argument is wide of the mark.

When reviewing a trial court's denial of directed verdict, our standard is straightforward: under the evidence as a whole, would it be clearly unreasonable for a jury to find guilt?[3] The evidence is reviewed in a light most favorable to the Commonwealth.[4]

An individual may be convicted of first-degree burglary when, "with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom,"[5] he is armed with a deadly weapon, causes physical injury to a person, or uses or threatens the use of a dangerous instrument against a person. Williams argues the Commonwealth failed to

---

[2] In the interest of thoroughness, Williams was also sentenced to five years' and fifteen years' imprisonment for the tampering and burglary convictions, respectively. The sentences were ordered to run concurrently.

[3] *See Commonwealth v. Fletcher*, 59 S.W.3d 920, 921 (Ky. 2001).

[4] *See Commonwealth v. Jones*, 238 S.W.3d 665, 668 (Ky. 2009); *see also Commonwealth v. Sawhill*, 660 S.W.3d 3, 4 (Ky. 1983).

[5] Kentucky Revised Statute (KRS) 511.020(1).

present any evidence that Williams entered Montgomery's residence unlawfully, entered it with a shotgun, or remained unlawfully in it with the intent to commit a crime.

We admit that the Commonwealth did not present evidence Williams entered Montgomery's residence unlawfully—in fact, the Commonwealth did not attempt such proof. According to the evidence, Montgomery invited Williams and Hill into his residence. But Williams's assertion that this warrants a directed verdict is misguided because unlawful entry is not the only way an individual can be found guilty of first-degree burglary. KRS 511.020 provides that entering *or* remaining unlawfully is sufficient for a first-degree burglary conviction. The Commonwealth was not required to prove Williams entered unlawfully.

As for the lack of proof that Williams entered the premises with the shotgun, Williams again misreads KRS 511.020. At trial, there was proof that Hill carried the shotgun into Montgomery's residence and placed it beside the couch where he was seated. This is sufficient for Williams to be convicted of first-degree burglary because the statute requires Williams or *another participant in the crime* to be armed with a deadly weapon. Williams and Hill entered Montgomery's residence together with, at the very least, the intent to retrieve property unlawfully from Montgomery or purchase illegal drugs from Montgomery. And Hill was armed with a deadly weapon. Nothing else was required. Hill's *entering* with the shotgun, moreover, says nothing about Williams *leaving* with the shotgun, which is also sufficient for first-degree burglary.

4

Finally, William argues he did not remain unlawfully with the intent to commit a crime because he was invited inside and Montgomery did not revoke the license because he was murdered. Williams cites *Wilburn v. Commonwealth*,[6] the liquor-store-robbery case, as support for his argument. The problem with this is rather simple: the Commonwealth presented evidence that Montgomery explicitly revoked Williams's license to be in his home and Williams remained inside. No such evidence was presented in *Wilburn*—in that case, attempting to fend off the attempted robbery, the shop owner promptly fired a gun at the defendant, an action we construed as the functional equivalent of a demand to leave the premises. The defendant left immediately after the shots were fired, thereby not remaining unlawfully. The instant situation does not involve such implicit revocation. Evidence was offered that Montgomery arose from the couch, told Williams and Hill to leave his home, and, unlike the defendant in *Wilburn*, Williams and Hill did not leave. Instead, Williams shot Montgomery in the chest. A directed verdict was not warranted because it was not unreasonable for a jury to find Williams guilty of burglary given the evidence.

As a seemingly last-ditch effort, Williams asserts that his conviction presents a unanimity problem[7]—specifically, the burglary jury instruction said "entered *or* remained unlawfully"[8] and there was no evidence he *entered*

---

[6] 312 S.W.3d 321 (Ky. 2010).

[7] This refers to Williams's right to a unanimous jury verdict under Section 7 of the Kentucky Constitution. This right has likewise been recognized—especially recently—throughout our case law, statutory law, and rules of this Court. *See Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013); KRS 29A.280(3); Kentucky Rules of Criminal Procedure (RCr) 9.82(1).

[8] Emphasis added.

5

unlawfully. To Williams, the jury instructions permitted the jury to decide between two theories without indicating what theory served as the basis for the conviction; in other words, some jurors may have believed Williams entered unlawfully with the shotgun, while others may have believed Williams remained unlawfully and left with the shotgun. This argument was never presented to the trial court and is, therefore, unpreserved—Williams requests our review of this issue for palpable error.[9]

In the broad sense, we have recognized two main types of unanimous-verdict violations: (1) "when multiple counts of the same offense are adjudicated in a single trial" and identical instructions are submitted to the jury; and (2) "when a general jury verdict is based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof."[10] Williams presents neither.

Instead, Williams takes issue with a jury instruction that contains arguably surplus language—namely, language regarding Williams entering unlawfully; a theory of criminal liability that the Commonwealth conceded was not applicable to Williams. We discussed an argument of this nature in *Travis v. Commonwealth*[11] and held that "such flawed instructions only implicate unanimity if it is reasonably likely that some members of the jury actually followed the erroneously inserted theory in reaching their verdict."[12] To the extent it was flawed to insert the "enter unlawfully" language in the jury

---

[9] *See* RCr 10.26.

[10] *Martin v. Commonwealth*, 456 S.W.3d 1, 6-7 (Ky. 2015) (internal quotation marks and alteration omitted).

[11] 327 S.W.3d 456 (Ky. 2010).

[12] *Id.* at 463.

instruction, it was harmless because it is not reasonably likely the jury actually convicted Williams on that theory, given the evidence as a whole. In any event, Williams failed to preserve any alleged instructional error and absent is the manifest injustice necessary for an error to be palpable.

## B. The Commonwealth Presented Sufficient Evidence to Support Williams's Tampering With Physical Evidence Conviction.

The sawed-off shotgun used to murder Montgomery was discarded in a field between Montgomery's and Williams's residences. For years the weapon went undiscovered. When Hill came forward and assisted in the investigation, he led police to the shotgun, by then rusted and concealed by overgrown weeds. Williams alleges the Commonwealth did not present sufficient evidence to warrant a tampering-with-physical-evidence conviction because there was no proof Williams concealed the weapon.[13] The Commonwealth concedes the evidence was circumstantial but argues the evidence was adequate nonetheless.

No defendant may be convicted of a crime unless the prosecution proves every element of the charged offense. The criminal defendant is denied due process of law if convicted upon less than proof of all elements of the crime.[14] But the elements of a crime may be proved by circumstantial evidence alone.[15] And, as we mentioned above, our standard of review is whether, given the evidence as a whole, it would be clearly unreasonable for a jury to find guilt.

---

[13] Williams challenged the tampering charge at the trial level and asserts here the issue is adequately preserved. The Commonwealth, on the other hand, argues Williams only challenged the burglary conviction with his directed-verdict motion. Given our resolution of the issue, its preservation is of little consequence.

[14] *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002).

[15] *Turner v. Commonwealth*, 328 S.W.2d 536, 538 (Ky. 1959) ("Circumstantial evidence alone is sufficient to sustain a conviction.").

A defendant is guilty of tampering with physical evidence "when, believing that an official proceeding is pending or may be instituted, he: (a) destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding."[16] Mirroring this language, the trial court instructed the jury to find guilt if it believed Williams "concealed or hid or removed a shotgun which he believed to be produced or used in an official proceeding" and he did so intentionally.

The evidence at trial was thin. But it pointed to a single scenario, especially when viewed in a light most favorable to the Commonwealth: Williams shot Montgomery, fled the residence with Hill while in possession of the shotgun, and then tossed the gun out of the car window into a field while returning to his residence. Hill saw this, of course, which is why he knew where the gun was located. Again, there is little direct evidence of this scenario, but the evidence was clear that the gun was Williams's, he loaded it and placed additional shells in his pocket before leaving for Montgomery's, and he carried the gun to the car as the duo left to kill Montgomery. In other words, Williams was in possession of the gun at nearly all relevant times except upon entering Montgomery's residence. Hill did not testify that Williams handed him the gun after shooting Montgomery, so it was reasonable for the jury to believe Williams fled with the gun and discarded it in an attempt to keep police from locating the weapon.

_____

[16] KRS 524.100.

8

The main thrust of Williams's argument seems to be that the gun was not concealed; it was just hidden in weeds. Admittedly, Williams did not bury the gun underground or otherwise camouflage the weapon in some way, but we are unsure what import this has on the sufficiency of the Commonwealth's evidence. Williams flung the gun into a field of weeds that hid the weapon from view. Would Williams's argument be different if he had thrown the gun in a trash can or lake? The evidence tended to prove that Williams was responsible for the shotgun being out of sight—*conceal* is defined as "to hide; withdraw or remove from observation; cover or keep from sight."[17] The Commonwealth's evidence was sufficient to defeat a motion for directed verdict.

## C. The Admission of Incriminating Hearsay Testimony was not Erroneous.

During trial, the Commonwealth called Henrietta Ponder to testify regarding, among other things, various incriminating statements Williams allegedly made to her about Montgomery. Williams told Ponder Montgomery would "pay for it one day"; "that son of a bitch is the one that testified against me"; and "he's gone, he's dead." Williams objected when the Commonwealth called Ponder to testify and asserted he had not been provided adequate notice that Ponder would be a witness and would offer testimony on these incriminating statements.

Because our criminal rules require notice of such testimony,[18] Williams essentially claims the Commonwealth committed misconduct. But the flaw in Williams's theory lies in the fact that Ponder also provided the same testimony

---

[17] http://www.dictionary.com/browse/conceal

[18] *See* RCr 7.24(1); *Chestnut v. Commonwealth*, 250 S.W.3d 288 (Ky. 2008).

at Hill's criminal trial. Williams's counsel acknowledged watching the recording of that trial four or five times in preparation for Williams's trial. The trial court, as a result, professed to be at a loss to understand how Williams was surprised by the Commonwealth's calling Ponder to testify. In a moment of candor, Williams's counsel admitted that he was not surprised Ponder was called to testify. So the trial court overruled Williams's objection to Ponder's testimony but did limit her testimony to statements made during Hill's trial.

Williams now attempts to push a narrative filled with obfuscation and gamesmanship by the Commonwealth. The Commonwealth did not, as it should have, provide a formal discovery response to Williams regarding Ponder's testimony. But there is no evidence that this failure was deliberate. In *Chestnut*, we noted that "[t]he Commonwealth's ability to withhold an incriminating oral statement through oversight, or otherwise, should not permit a surprise attack on an unsuspecting defense counsel's entire defense strategy" because this would "run afoul of the clear intent of RCr 7.24(1)."[19] Here, Williams has made no argument—actually cannot make such an argument—that he was caught off guard by Ponder's testimony or his defense strategy was jeopardized. Williams's counsel knew exactly what Ponder was going to say, and similar versions of Williams's statements to Ponder were admitted through the testimony of other witnesses.

We should be clear that we do not condone the Commonwealth's behavior,[20] and we are in no way crafting a general rule that notice is not

---

[19] *Chestnut*, 250 S.W.3d at 296.

[20] Our past strong disapproval of hide-the-ball tactics remains true today: "[I]t is imperative that the Commonwealth provide full and timely discovery pursuant to RCr 7.24 and 7.26. Failure to do so will result in severe sanctions." *Roberts v.*

10

required if the witness testifies at the co-defendant's trial. The Commonwealth blundered, but the blunder does not arise to an error warranting reversal under the circumstances of this case. And we cannot say the trial court abused its discretion in denying Williams's motion for directed verdict. To the contrary, the trial court properly exercised its discretion by crafting a remedy for Williams: Ponder's testimony was limited only to what she offered previously at Hill's trial. In other words, Ponder was only permitted to testify about what Williams's counsel was already aware of and prepared to meet in William's defense.

### D. Williams's Right to Present a Defense was not Denied When the Commonwealth did not Conduct Requested DNA Evidence.

A bedspread covered the couch upon which Montgomery was sitting when he was murdered. During the crime-scene investigation, police removed a section of the bedspread for testing purposes. Williams requested this sample be tested for gunshot residue before trial, but the testing was never performed. Instead, the Commonwealth's Attorney only requested DNA testing be performed on the sample.[21] But the evidence log noted that the sample had "gunshot residue – powder burns."

---

*Commonwealth*, 896 S.W.2d 4, 7 (Ky. 1995). Discovery is a vital aspect of ensuring a defendant is afforded his full constitutional guarantees—it should not be reduced to a game of cat and mouse. *See James v. Commonwealth*, 482 S.W.2d 92, 94 (Ky. 1972).

[21] The DNA testing provided the rather unremarkable conclusion that the blood on the bedspread was Montgomery's. This was of little surprise, considering Montgomery was the murder victim and there was no argument of struggle or altercation between the parties. Williams claims his rights were violated because the Commonwealth did not provide the results in a timely manner. We agree to the extent that the Commonwealth should have provided the results earlier—this is consistent with our overall disappointment in the Commonwealth's management of the discovery in this case. But that said, we are unable to find Williams was prejudiced by the delay because there was never any argument that any DNA other than Montgomery's should or would be on the bedspread. More directly, Williams has offered no argument that

On the first day of trial, Williams moved to dismiss the case because the gunshot-residue testing had not been performed. The Commonwealth's Attorney admitted the mistake, blaming it on a miscommunication with the lab. In response, the Commonwealth's Attorney proposed to the trial court that Williams be permitted to argue gunshot residue was present despite the absence of test results and question the detective who collected the sample because he also believed gunshot residue to be present. And the Commonwealth suggested a continuance may be appropriate. The trial court noted that because both parties believed gunshot residue was present on the bedspread, Williams could argue that at trial without the lab results and could request a missing-evidence instruction at the appropriate time. In the end, the trial court denied Williams's motion to dismiss.

Williams now argues he was denied due process because the gunshot-residue results were critical to his defense. Specifically, Williams planned to use gunshot residue to disprove Barbara Aarons's account of the murder and impugn her credibility. If gunshot residue were on the bedspread, in Williams's view, it was more likely that Montgomery was seated rather than standing as Aarons claimed.

We should begin by noting that Williams failed to request a missing-evidence instruction—an instruction "permitting the jury to infer that the missing evidence, if available, would be adverse to the Commonwealth and favorable to the defendant."[22] And it is important to point out that Williams

---

the DNA testing could have been exculpatory or led to another suspect. Instead, he simply rails against the Commonwealth's sloppy practice.

[22] *Estep v. Commonwealth*, 64 S.W.3d 805, 809 (Ky. 2002) (citing *Sanborn v. Commonwealth*, 754 S.W.2d 534, 539-40 (Ky. 1988).

12

was not prohibited from arguing gunshot residue was found on the bedspread. Again, the detective who collected the sample believed gunshot residue to be present and the evidence log indicated this. And the Commonwealth even agreed with Williams on this point.

So again we encounter a situation where the Commonwealth failed to uphold best practices, but Williams can show little or no prejudice. Williams was able to offer proof that gunshot residue was on the bedspread and how that would indicate Montgomery's position when he was shot. The lab results would have been an additional aspect of support for Williams's attack on Aarons, to be sure. But the Commonwealth's failure to obtain those results does not, given the circumstances, equate to a violation of Williams's right to due process or present a defense. A missing-evidence instruction—a remedy the trial court seemed willing to provide at William's request—would most likely have been sufficient to ameliorate any damage done by the Commonwealth's failure to test the bedspread for gunshot residue. Williams's constitutional rights simply were not violated.

### E. The Admission of Hearsay Evidence was not Palpable Error.

Finally, Williams challenges the admission of a statement allegedly made by Hill to Brenda Worley, an acquaintance of both Williams and Hill. This issue is unpreserved, but Williams requests we engage in palpable-error review.

At trial, Worley testified that she learned of Montgomery's murder the morning after it occurred. Worley testified that Hill told her that he had never seen anyone get killed before. Williams challenges this statement as inadmissible hearsay. Hill did not testify at Williams's trial because he was tried separately and asserted his Fifth Amendment privilege to remain silent.

13

Initially, we are inclined to find the challenged statement is not hearsay. As defined by our rules of evidence, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[23] More than proving whether or not he had seen anyone killed before, the offered statement serves as an indicator of Hill's state of mind upon returning to Williams's residence after going to see Montgomery, a purpose for which hearsay is admissible under our rules.[24] That being said, the statement must still be relevant to an issue in the case and we are unable to identify what state of mind Hill's statement revealed. Hill's statement was therefore erroneously admitted.

This admission does not, however, rise to the level of palpable error. For an error to be palpable, it "must result in manifest injustice, either through the probability of a different result or [be] so fundamental as to threaten a defendant's entitlement to due process of law."[25] If Worley had not been permitted to provide Hill's statement, there is little probability of a different result at Williams's trial. The evidence still indicated that Williams was at Montgomery's residence the night he was murdered, sought revenge against Montgomery, traveled to Montgomery's residence with a shotgun, and Montgomery died from a shotgun blast. This point in Aarons's testimony—

---

[23] Kentucky Rule of Evidence (KRE) 801(1)(c). Absent an applicable exception listed in our rules, hearsay is inadmissible. KRE 802.

[24] *See* KRE 803(3) ("Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.").

[25] *Jones v. Commonwealth*, 331 S.W.3d 249, 256 (Ky. 2011) (internal quotation marks omitted).

whether Montgomery was seated or standing when murdered—was relatively minor in the grand scheme of her account. Williams's entitlement to due process was not threatened by the admission of Worley's mention of Hill's statement.

### III.     CONCLUSION.

Because none of Williams's claims merit reversal, we affirm the judgment of the trial court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Andy Beshear
Attorney General of Kentucky.

Kenneth Wayne Riggs
Assistant Attorney General of Kentucky

COUNSEL FOR APPELLEE:

Kathleen Kallaher Schmidt
Assistant Public Advocate