RENDERED:  DECEMBER 5, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0037-MR

COMMONWEALTH OF KENTUCKY          APPELLANT


            APPEAL FROM LOGAN CIRCUIT COURT
v.       HONORABLE JOE W. HENDRICKS, JR., JUDGE
            ACTION NO. 22-CR-00283


DARRELL GENE EVANS          APPELLEE


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  KAREM, McNEILL, AND TAYLOR, JUDGES.

KAREM, JUDGE:  The Commonwealth of Kentucky appeals from a Logan

Circuit Court order entered December 7, 2023, granting Darrell Gene Evans'

("Darrell's") motion to dismiss the indictment against him pursuant to

KRS[1] 503.085 and KRS 503.055.[2]  The former provision, if applicable, precludes

---

[1]  Kentucky Revised Statutes.

[2]  KRS 503.055 is known informally as "the castle doctrine."

criminal prosecution including arrest, custodial detention, and charging. The latter provision enumerates what conduct is necessary to obtain immunity when defending one's home.[3] Having considered the law and the facts, we reverse the trial court and remand the case for the indictment to be reinstated allowing the prosecution of Darrell to proceed.

## FACTS

Darrell is an over-the-road trucker, and at some point, his adult son Richard ("Richard") and his children moved into Darrell's home. However, it is undisputed that three to four weeks before the shooting, Darrell told Richard to move out after he came home for the third time to find the children unsupervised. Richard complied; however, one week before the shooting, Richard had returned to the home to shower. Additionally, Richard's mail was still delivered to Darrell's address.

On the day of the shooting, there were three witnesses to the events that transpired outside Darrell's residence. These witnesses include Darrell, Richard, and Darrell's brother, George. The parties to the appeal agree that George had come to his brother's home in the hopes of finding work for which Darrell would pay him.

---

[3] KRS 503.085 cites other provisions permitting the use of force that were not applied here. And to be clear, a court's decision regarding self-defense immunity is not to be confused with a jury's consideration of perfect or imperfect self-defense for purposes of trial.

While George was working in the yard, Richard arrived, unarmed, and began helping him change the string on the weed-eater. When Darrell saw Richard, he immediately asked Richard about money he owed him. Darrell had loaned his son money, and Richard had allegedly taken a loose change bucket without permission. Richard became agitated and balled up his fists. Darrell asked, "is that for me?" and Richard replied, "it can be." It was at that point that the two men entered the house.

Darrell made only one consistent statement throughout the investigation regarding what transpired inside the house. He maintains that as he approached his gun, as it lay on the arm of the couch, Richard stated, "if you pick up that pistol, that will be the last mother fucking thing you do." However, in making its findings of fact, the trial court stated, "[a]ll the various statements of Darrell Evans memorialized by law enforcement are consistent and the prosecution does not contest Darrell's version of events." As a footnote to this assertion, the court went on to state "[t]he Commonwealth agreed that Darrell's statements given to law enforcement were truthful." However, a careful review of the briefs and the hearing proves otherwise.

In the case summary provided during discovery, law enforcement noted two versions of Darrell's explanation of what happened. The first was made in the back of Trooper Gregory's patrol vehicle immediately following the

incident.  The second statement, given approximately 2 ½ hours later, was recorded at the Logan County Sheriff's Office once Darrell was read his rights.

In his initial statement, Darrell explained that he and Richard had a verbal argument in the driveway.  Darrell went inside his residence to get away from Richard, but Richard followed him into the house.  He went on to say he told Richard to leave.  He stated he did not mean to hit Richard; he just picked up the gun and shot.

Darrell's second statement to law enforcement was basically the same, with one notable exception; he did not tell Richard to leave.  When asked specifically if he told Richard to stop or not come any closer, Darrell responded that he did not say anything.

The Crime Supplement filed by Officer Joe Gregory provides further details from Darrell.  As background, Darrell stated Richard had called him a few months earlier and had nowhere to live with his children.  Darrell let them move into the house.  However, sometime later Richard took his kids to Owensboro, but ever since, "he just comes and runs through the house."  In relation to what transpired in the house on the day of the shooting, Darrell said Richard had stepped in there with his fists balled up.  Darrell said he was scared and intimidated, although, when asked if there had been anything physical between them in the past, Darrell replied that there was "pushing," and Richard would "bow up" on him.

A competency evaluation of Darrell was ordered by the court and entered into evidence. As reported by the evaluating doctor, Darrell stated he had a clear memory of the events that transpired the day he shot his son. He told the evaluator that there is a step down into the living room where the gun was kept, and as he walked toward the sofa, he tripped and fell. He stood up, picked up the gun, and as he was regaining his footing, the gun discharged without him intentionally firing it. He went on to explain that his eyes were closed, and he heard the shot.

Other evidence provided for the judge's review included a statement from Darrell's wife in which she reported that she left her husband because, three months prior, Darrell had been intoxicated and had pointed a gun in her face. She was able to fight him off, but did receive injuries. Additionally, Darrell admitted to regularly drinking at least 12 beers a day beginning around 8:00 a.m. Darrell acknowledged that, on the day in question, he drank a few beers prior to the confrontation with Richard, but claimed he was not intoxicated.

Lastly, both Darrell and his brother reported that Richard was addicted to illegal drugs, and both believed he was high the morning of his death. In fact, six baggies of methamphetamine were found on his person.

## APPLICABLE STATUTORY LAW

The specific facts of the case *sub judice* require an analysis of the interplay among three statutes to determine if there is immunity from criminal prosecution: KRS 503.085, KRS 503.080, and KRS 503.055.

> **503.085 Justification and criminal and civil immunity for use of permitted force; exceptions**.
>
> (1) A person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force, unless the person against whom the force was used is a peace officer . . . . As used in this subsection, the term "criminal prosecution" includes arresting, detaining in custody, and charging or prosecuting the defendant.
>
> (2) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (1) of this section, but the agency may not arrest the person for using force unless it determines that there is probable cause that the force that was used was unlawful.

As applicable to the case *sub judice*, KRS 503.080 outlines the acceptable use of physical force when protecting property and states "[t]he use of physical force . . . is justifiable when the defendant believes that such force is immediately necessary . . . under those circumstances permitted pursuant to KRS 503.055 . . . ." KRS 503.080(1)(a).

KRS 503.055 pertains to the "[u]se of defensive force regarding [a]

dwelling, residence, or occupied vehicle." The law establishes a presumption:

> A person is presumed to have held a reasonable fear of
> imminent peril of death or great bodily harm to himself
> or herself or another when using defensive force that is
> intended or likely to cause death or great bodily harm to
> another if:
>
> > (a) The person against whom the defensive force was
> > used was in the process of unlawfully and forcibly
> > entering or had unlawfully and forcibly entered a
> > dwelling, residence, or occupied vehicle[.]

KRS 503.055(1)(a).

## STANDARD OF REVIEW

The standard of review for a criminal immunity case was summarized

in *Commonwealth v. Bennett*, 553 S.W.3d 268 (Ky. App. 2018).

> The standard of review for immunity claims under
> KRS 503.085 is whether a substantial basis supports the
> trial court's findings of fact. *Commonwealth v. Lemons*,
> 437 S.W.3d 708, 715 (Ky. 2014). On appellate review,
> this Court must establish whether the trial court, after
> using a totality-of-the-circumstances analysis, had a
> substantial basis for finding probable cause. *Id.* (citation
> omitted). The prosecution has the burden of proving
> "there is probable cause to conclude that the force used
> was not legally justified." *Rodgers v. Commonwealth*,
> 285 S.W.3d 740, 754 (Ky. 2009). Probable cause has
> been defined as "reasonable grounds for belief, supported
> by less than prima facie proof but more than mere
> suspicion." *Lemons*, 437 S.W.3d at 715 (citation and
> internal quotation marks omitted).

KRS 503.085 requires the Commonwealth establish probable cause of unlawful use of force using the then-existing evidence of record. "The burden is on the Commonwealth to establish probable cause and it may do so by directing the court's attention to the evidence of record including witness statements, investigative letters prepared by law enforcement officers, photographs and other documents of record." *Rodgers*, 285 S.W.3d at 755. There is no corresponding right for the defendant to oppose the Commonwealth's proof of probable cause with his own proof supporting his justification. *Id.* Prosecution must proceed when the Commonwealth meets its probable cause burden. *Id.* at 754-55.

*Id.* at 270.

The Court in *Bennett* went on to explain "[t]he prosecution may overcome this low threshold by providing substantial evidence of imperfect self-defense or the existence of conflicting evidence in the record to show potential unlawful conduct." *Id.* at 271. With this standard in mind, we return to the relevant law and facts at issue in the present case.

## ANALYSIS

### I.     Issue Preclusion

We first address the contention by Darrell that the Commonwealth is prohibited from asserting that the trial court was incorrect when it stated "[a]ll the various statements of Darrell Evans memorialized by law enforcement are consistent and the prosecution does not contest Darrell's version of events." We disagree.

-8-

It is well-settled law that an appellant cannot raise new issues on appeal. "[A] party may only present those issues that were fully presented to the trial court and, further, may not bring forward new legal grounds on appeal to challenge those errors." *Henderson v. Commonwealth*, 438 S.W.3d 335, 343 (Ky. 2014). However, in the case *sub judice*, the Commonwealth is not raising a new issue. They are challenging the premise upon which the trial court relied in making its decision. Such advocacy is wholly appropriate, and arguably necessary in many cases, when challenging a court order. A careful review of the record reveals that, while the Commonwealth agreed "there is not much of a factual dispute," they consistently argued that the details of the case, the intricate differences in Darrell's multiple statements, made the case one of self-defense to be placed before a jury and thus precluded the grant of immunity from prosecution.

**A) <u>Conflicting Evidence</u>**

"The Supreme Court of Kentucky has recognized 'conflicting evidence as to whether [the] use of deadly force was justified' supports the preclusion of a pretrial finding of immunity." *Bennett*, 553 S.W.3d at 272 (citing *Rodgers v. Commonwealth*, 285 S.W.3d 740 (Ky. 2009)). The existence of conflicting evidence in the case *sub judice* precludes the granting of Darrell's motion for prosecutorial immunity.

-9-

The court, in granting Darrell's motion for prosecutorial immunity, stated it relied on the following to make its finding of facts: the uniform citation; the Logan County ECC "Call for Service" Log; a supplemental case report; the KYIBRS[4] with supplements; the indictment; thirty-eight color photographs; Darrell's competency evaluation; the victim's autopsy report; and a video and audio recording of an interview of the defendant, among other evidence. A careful review of these records, as outlined in our recitation of facts, reveals small but crucial discrepancies in Darrell's multiple statements regarding the events that transpired in his residence leading up to the shooting of his son, most notably: the case summary identifies two sets of facts, one wherein Darrell told his son to leave the residence, and one where Darrell made no statements to his son prior to the fatal shooting; and, in his competency evaluation, Darrell asserted he had a clear memory of what transpired the day of the shooting and explained that the gun accidentally went off when he tripped and fell. Other inconsistencies exist, but these three distinct stories alone preclude the application of prosecutorial immunity. The trial court erred in prematurely granting immunity and not allowing a jury to decide on the facts of the case.

---

[4] Kentucky Incident-Based Reporting System.

**B) <u>KRS 503.055</u>**

The proper standard to decide if Darrell is entitled to immunity is whether the trial court, based on the record, had a substantial basis for finding probable cause to believe Darrell's use of deadly force was unlawful, not whether Darrell's self-defense was justified. *Bennett*, 553 S.W.3d at 271. "Substantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Miller v. Tema Isenmann, Inc.*, 542 S.W.3d 265, 270 (Ky. 2018) (internal quotation marks omitted) (quoting *Smyzer v. B.F. Goodrich Chemical Co.*, 474 S.W.2d 367 (Ky. 1971)).

The parties agree that, to trigger immunity in the case at bar, Richard's entry into the residence must have been "unlawfully and forcibly." The trial court believed, using the substantial evidence standard and after analyzing the facts, that Darrell was entitled to immunity pursuant to KRS 503.055. However, we find the trial court's conclusion clearly erroneous.

It is important to note, for KRS 503.055 to apply, there must be a finding of both an *unlawful* entry and a *forcible* one; it is not an "either/or" question. Curiously, the trial court focused only on the second aspect of the test, analyzing only whether or not Richard's entry was forcible.

In the trial court's analysis, it correctly noted that Kentucky's Penal Code fails to define the term "forcible entry." Additionally, it recognized that the

term as utilized in Kentucky's civil forcible detainer statute is immaterial to the criminal issue. Therefore, the court looked beyond Kentucky law to that of other jurisdictions and treatises. However, we need not look any further than our own jurisprudence to properly analyze the question of whether Richard made an unlawful and forcible entry into the home.

To begin our analysis, we will address the first component of "the castle doctrine"—whether Richard made unlawful entry into the residence. When determining if someone unlawfully entered a dwelling, it is instructive to understand the criminal charge of burglary—wherein a person is guilty of burglary when, with intent to commit a crime, he or she knowingly enters or remains unlawfully in a building. KRS 511.020.

In *Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010), brothers Essamond and Terrance Wilburn attempted to rob a liquor store. After entering the building, Essamond pointed a pistol at the manager of the store and stated, "we are here for the money[.]" *Id*. at 322. He subsequently pulled the trigger, but the gun did not fire. *Id*. The manager then grabbed his own gun and fired at the would-be robbers as they fled the building, running in different directions. *Id*. Essamond was convicted on all charges for which he was tried, including burglary. In his appeal, Essamond argued that he should have been granted a directed verdict on the count of burglary. The Court agreed, noting the liquor store was a public

-12-

building and, by statute,[5] "even though [Essamond] had the intent to rob the business when he entered, the statute provides that he nevertheless was licensed or privileged to be there upon his initial entry. It follows that [Essamond] did not enter the premises unlawfully." *Wilburn*, 312 S.W.3d at 324.[6]

Eight years later, the Supreme Court once again examined the question of what evidence was necessary for the Commonwealth to prove burglary. In *Williams v. Commonwealth*, 486 S.W.3d 291 (Ky. 2016), the Court specifically reviewed, among other things, whether the Commonwealth needed to prove that the accused *unlawfully* entered the building. The evidence submitted to the jury included testimony that Stephen Williams had gone to Paul Montgomery's residence and been invited inside. *Id.* at 295. Once inside, an argument ensued, and Williams grabbed a shotgun leaning against a couch and shot and killed Montgomery. *Id.* Williams was subsequently found guilty of burglary, among

---

[5] KRS 511.090:

> (1) A person "enters or remains unlawfully" in or upon premises when he is not privileged or licensed to do so.

> (2) A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license or privilege unless he defies a lawful order not to enter or remain personally communicated to him by the owner of such premises or other authorized person.

[6] The first prong of the "enters or remains unlawfully" test is the only relevant part of the Court's decision in *Wilburn* to the case at bar. However, it may be informative to note the Court also found Essamond did not unlawfully remain in the building because he fled once the manager revoked his permission to be in the building by firing his own gun at Essamond. *Id.*

-13-

other charges. Williams appealed the conviction maintaining that the Commonwealth failed to present any evidence that Williams entered the residence unlawfully. *Id.* The Court agreed that the Commonwealth did not present evidence Williams entered Montgomery's residence unlawfully, nor did the Commonwealth attempt to do so. *Id.* at 296. The Court went on to find, on other grounds, that the evidence was sufficient for the jury to convict Williams of burglary. *Id.*

This case is instructive because the Court acknowledged Williams was in the dwelling lawfully. No subsequent actions of either party changed that fact. Instead, the Court found Montgomery explicitly revoked that permission when he told Williams to leave his home, thereby invoking the second prong of the analysis in a burglary case, unlawfully *remaining* in the building. *Id.*[7]

Both *Wilburn* and *Williams* provide an appropriate analysis of the first prong of KRS 503.055, whether Richard entered the dwelling unlawfully. We find that there is more than enough contradictory evidence to Darrell's contention that Richard unlawfully entered the dwelling to present to a jury. Darrell himself stated Richard, even after moving to Owensboro, "just comes and runs through the house." He further acknowledged that Richard had been there to shower just one

---

[7] Notably, unlawfully remaining in the building is not a factor required to invoke "the castle doctrine."

-14-

week prior to the shooting. And Richard continued to receive his mail at Darrell's residence. Furthermore, even if Darrell did tell Richard to leave, that fact would not negate the lawfulness of Richard's entry into the residence in the first place.

KRS 503.055 specifically mandates a finding of *both* the unlawful *and* forcible entering of a building. KRS 503.055(2). There is adequate evidence to support the argument that Richard lawfully entered the building and, thus, we end our analysis here. We need not address the issue of whether or not there was forcible entry into Darrell's home because a finding of both unlawfulness and force is needed to trigger "the castle doctrine."

## CONCLUSION

For the foregoing reasons, we find that the Commonwealth met its burden of showing probable cause that the force Darrell used was unjustified. We thus REVERSE the Logan Circuit Court's order entered on December 7, 2023, and REMAND the case for the reinstatement of the indictment against Darrell.

TAYLOR, JUDGE, CONCURS.

MᶜNEILL, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

MᶜNEILL, JUDGE, DISSENTING: I respectfully dissent. The Commonwealth places significant emphasis on its claim that "omitted facts from the KCPC report, where Evans claimed the shooting was accidental, should have ended his immunity claim." Essentially, the Commonwealth's argument here is that there was

inconsistency in Darrell's interviews indicating accidental versus intentional shooting, thus negating immunity. The Majority appears to agree.

If the Commonwealth contends that this was an accidental shooting, then it is a mystery why Darrell was being prosecuted for murder. *See* KRS 507.020. Having reviewed all the relevant post-shooting interview materials, I conclude that they are not inconsistent with an immunity finding.

In contrast, the Majority presents the evidence as containing "discrepancies" that are "small but crucial." The Majority elaborates on these alleged discrepancies as follows:

> one wherein Darrell told his son to leave the residence, and one where Darrell made no statements to his son prior to the fatal shooting[.]

Even if accurate, these diminutive disparities do not warrant reversal. And finally, the Majority cites to Darrell's psychiatric evaluation, ordered by the court for competency purposes, wherein he tells the examiner that the gun "accidentally went off when he tripped and fell." Even if admissible at trial, this evidence is barely probative.

The circuit court considered nearly a dozen materials, including Darrell's multiple post-shooting interviews. The court made the following findings:

> The facts of this case are almost entirely undisputed. On August 4, 2022, shortly before 12:47

-16-

p.m., the Defendant, Darrell Evans, was outside his home, speaking with his brother, George Evans about doing some yard work. Richard Ev[a]ns, the deceased victim in this case and Darrell's son, appeared. Darrell asked Richard where his money was. Richard balled up his fists, stiffened his frame, and in response said, "I don't have the mother fucking money." Darrell asked Richard, referring to Richard's balled up fists, "Are those for me?" Richard in response said, "They can be." Darrell, indicating that he was aware of how Richard would act, decided to go into his home. Richard followed Darrell into the house, retaining his aggressive posture, and followed Darrell into his living room. After entering Darrell's home, without consent, and as Darrell approached the couch where he usually kept his pistol, Richard stated that if he grabbed the pistol "it will be the last mother fucking thing you'll ever do." Darrell then grabbed his pistol from the couch and fatally shot Richard. Richard was found by law enforcement just inside the living room doorway, slumped against the wall, "obviously deceased" from a gunshot wound to the head.

Law enforcement noted that Richard's distance from the location of the firearm to the deceased's body was about five feet. The firearm was found on the arm of the love seat where Darrell had obtained it. Law enforcement found six baggies of methamphetamine in the left shorts pocket that Richard was wearing. Darrell's brother George confirmed that Richard was "on drugs bad."

All the various statements of Darrell Evans memorialized by law enforcement are consistent and the prosecution does not contest Darrell's version of events. Darrell further stated that Richard, when previously affected by methamphetamine had gone so far as pushing him on past occasions. Though Darrell denies that Richard had committed any acts of serious violence,

> Darrell said that he would "back down" or accede to Richard's wishes to avoid confrontation.
>
> During the recorded interview in reference to Darrell's decision to use a pistol for self-defense, Darrell made reference to his own age and physical condition compared to Richard's. Richard was 6'00" and 155 pounds and was 37 years old. Darrell was 5'11" and 185 pounds, but over sixty years old. Darrell suffers from serious heart problems as well as other physical ailments.

(Footnotes omitted.) I conclude that these findings are reflective of the record, and certainly not inconsistent with an immunity finding.

The Majority also omits what I believe to be the most relevant cases. Instead, the Majority seeks refuge in analogy—burglary, to be precise. The following analysis needs no such sanctuary.

The first case to address immunity under KRS 503.085 is *Rodgers v. Commonwealth*, 285 S.W.3d 740, 752-53 (Ky. 2009). That case has been cited numerous times for various issues of law.[8] In a much more recent unpublished case, a previous panel of this Court observed in relevant part:

> In a review on the merits, a determination of whether the trial court correctly dismissed the indictment under these circumstances is deceptively difficult. A glance at our case law reveals that most motions arguing for immunity pursuant to KRS 503.085 do not succeed at the trial court level. This is not surprising, given that the Commonwealth must only show "probable cause to

---

[8] *See also* KY. PRAC. SUBSTANTIVE CRIM. L. § 5:21.50 (summarizing published cases applying KRS 503.085(1) since *Rodgers*).

-18-

> conclude that the force used . . . was not legally justified," which is a low threshold to clear. *Lemons*, 437 S.W.3d at 714 (quoting *Rodgers*, 285 S.W.3d at 754). The single case which appears to be most on point is *Commonwealth v. Bennett*, 553 S.W.3d 268 (Ky. App. 2018), in which the trial court *granted* immunity. This Court reversed and remanded with instructions to reinstate the charges in that case. However, *Bennett* is distinguishable because the trial court granted immunity on the basis of "inconsistent and ambiguous" evidence. *Id.* at 272.

*Commonwealth v. Lackington*, No. 2021-CA-0089-MR, 2022 WL 17365973, at *4

(Ky. App. Dec. 2, 2022).

Having researched the case law since *Bennett* and *Lackington* were

rendered, it appears that these two cases remain the most on point. The former

reverses a dismissal order because of immunity, and the later affirms. I believe

that the present case is more factually aligned with *Lackington*. Therefore, I would

affirm. It is worth citing *Lackington* at length.

> In *Bennett*, each party relied on its own interpretation of a video which was "of poor quality and lack[ed] audio." *Id.* at 269. We noted that the video, and the evidence as a whole, was "unclear and conflicting" as to whether Bennett "'provoke[d] the use of physical force' or 'was the initial aggressor[,]'" which would preclude self-defense immunity. *Id.* at 272 (quoting KRS 503.060(2)-(3)). We also noted that our Supreme Court has previously found that "'conflicting evidence as to whether [the] use of deadly force was justified' supports the preclusion of a pretrial finding of immunity." *Id.* (quoting *Rodgers*, 285 S.W.3d at 754). The fact that the evidence was conflicting and uncertain rendered the trial court's grant of immunity untenable. . . .

-19-

Here, unlike in *Bennett*, the evidence is much more straightforward. It is uncontroverted that [decedent] was intoxicated, agitated, and belligerent to the point of physical violence. . . . There was also the previous incident in April, attested to by [] Lackington, in which [decedent] physically attacked Lackington; this shows that Lackington had a reasonable belief that [decedent] would attack him again. The Commonwealth attempts to show probable cause of unlawful force by stressing particular inconsistencies in Lackington's accounts of what happened. . . .

The relevant question is whether there is probable cause of an unlawful use of force. After considering all of the evidence, the trial court determined there was not, and we give "great deference" to a trial court's probable cause determination. [*Illinois v.*] *Gates*, 462 U.S. [213, 236 (1983).]

*Lackington*, 2022 WL 17365973, at \*4-5.

To be clear, the present case is only the *third* case in Kentucky where the Commonwealth has appealed a trial court's decision granting immunity. The other two are *Bennett* (reversing), and *Lackington* (affirming). The nature of the extraordinary relief at issue here rarely favoring the criminally accused, understandably results in a deficit of cases—either published or unpublished.[9]

To summarize, the evidence in *Bennett* was a video of poor quality and lacking audio. In contrast, the evidence in *Lackington* was based on

---

[9] Although lacking in publication, *Lackington* is quite factually analogous. Given the sparse nature of the case law, I find it instructive and persuasive, but not binding. *See* Kentucky Rule of Appellate Procedure 41(A)(3) and (A)(4).

eyewitness testimony and may be summarized as: 1) decedent was intoxicated, agitated, and belligerent; 2) there was a previous altercation involving the decedent; and 3) decedent was physically threatening to the defendant and his niece immediately prior to the shooting.

Similarly, a summary of the evidence in the present case includes: 1) Richard appeared agitated and belligerent prior to the shooting, had a previous history of drug use, and had methamphetamine on his person when he was shot; 2) Darrell's interview statements indicate that Richard had physically and verbally confronted Darrell on previous occasions, and that Darrell obtained the pistol used in the shooting, at least in part, to protect himself from Richard; and 3) Darrell consistently attested that, immediately prior to the shooting, Richard followed Darrell into Darrell's home, clinched his fists in what may be reasonably determined to be an offensive posture, and said that his fists "could be" for Darrell. And as the circuit court recounted, there was a significant disparity in age, health, and physicality between Darrell and Richard. In this regard, the evidence at issue here is even stronger than in *Lackington*, where defendant and decedent were "[b]oth men . . . approximately sixty years old[.]" *Lackington*, 2022 WL 17365973, at *1.

Reasonable minds may differ as to the ultimate decision of immunity. Yet, criminal immunity is a creature of statute, with rare judicial application in

favor of the accused. Ultimately, I believe that the trial court, after using a totality-of-the circumstances analysis, had a substantial basis for its findings. *See Bennett*, 553 S.W.3d at 270. Without further guidance, I derive no factual or legal mandate for reversal. Indeed, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Thus, the trial court's "determination of probable cause should be paid great deference by reviewing courts." *Id.* at 236 (internal quotation marks and citation omitted).

In the absence of such deference, the Majority's decision will permit, if not require, the following: An elderly alcoholic will be arrested and placed back in the custody of the Commonwealth. He will be tried for killing his own son, a tragedy to which he is the only living eyewitness. He may or may not prevail, even though a trial judge determined that he should not even be placed in legal jeopardy. And all of this at the expense of the Commonwealth, in both treasure and toil. Therefore, I respectfully dissent.

BRIEFS FOR APPELLANT:

Russell Coleman
Attorney General of Kentucky

Matthew R. Krygiel
Assistant Attorney General
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Robert C. Yang
Assistant Public Advocate
Frankfort, Kentucky